UNITED STATES, Appellee

v.

Troy B. NORMAN, Sergeant
U.S. Marine Corps, Appellant

No. 14-0524

Crim. App. No. 201300152

United States Court of Appeals for the Armed Forces

Argued January 14, 2015

Decided April 29, 2015

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN, STUCKY, RYAN, and OHLSON, JJ., joined.

<u>Counsel</u>

For Appellant:  Lieutenant Jennifer L. Myers, JAGC, USN
(argued); Lieutenant David C. Dziengowski, JAGC, USN.

For Appellee:  Captain Matthew M. Harris, USMC (argued);
Lieutenant Ann E. Dingle, JAGC, USN, and Brian K. Keller, Esq.
(on brief); Colonel Stephen C. Newman, USMC.


Military Judge:  Chris J. Thielemann


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Chief Judge BAKER delivered the opinion of the Court.

Appellant, a sergeant in the U.S. Marine Corps, was convicted by a general court-martial composed of officers and enlisted members, contrary to his pleas, of child endangerment by culpable negligence in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2012). The members sentenced Appellant to confinement for sixty days, a dishonorable discharge, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged, and the United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed. United States v. Norman, No. NMCCA 201300152, 2014 CCA LEXIS 88, at *7, 2014 WL 656249, at *3, (N-M. Ct. Crim. App. Feb. 20, 2014) (per curiam). This Court granted review on the following issue:

> WHETHER THE CONVICTION FOR CHILD ENDANGERMENT BY CULPABLE NEGLIGENCE IS LEGALLY INSUFFICIENT WHEN THE ONLY TESTIMONY OFFERED TO PROVE ITS SERVICE DISCREDITING NATURE WAS ADMITTED IN ERROR.

Appellant's ten-month-old son, TBN, sustained second- and third-degree burns after Appellant left TBN unattended in a bathtub with running hot water. At trial, the Government called Staff Sergeant (SSgt) Neil C. Moody, a military police officer who responded to Appellant's 911 call, to testify that Appellant's conduct was of a nature to bring discredit upon the armed forces under Article 134, UCMJ. For the reasons set forth below, we

2

conclude that the admission of SSgt Moody's testimony was error under Military Rule of Evidence (M.R.E.) 701. Nevertheless, because "proof of the conduct itself may be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces," the remaining evidence admitted at trial was legally sufficient to support Appellant's conviction on the service discredit element under Jackson v. Virginia, 443 U.S. 307, 319 (1979). United States v. Phillips, 70 M.J. 161, 163 (C.A.A.F. 2011). Therefore, we affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.

## BACKGROUND

Appellant was stationed at Marine Corps Air Station Yuma, Arizona, where he was living at an on-base residence with his wife and his ten-month-old son, TBN. According to Appellant, on August 24, 2011, Appellant was watching over TBN while his wife was asleep in the other room, when TBN soiled himself. After attempting, and failing, to wipe TBN clean, Appellant moved his son to the bathroom in the upstairs hallway to bathe him. The only accounts of what followed were provided to military personnel by Appellant.

According to the testimony of SSgt Moody, Appellant initially told first responders that he:

> was cradling [TBN] . . . and set [him] on the edge of
> the tub and turned the water on and was letting it
> run, and he tested the water and he realized it was
> hot, so he turned the knob to full cold, let it run
> for a few minutes, and then started to lower his son
> down into the tub.  When the water splashed up, his
> son screamed, and that was when he realized the water
> was still too hot and he went and called 911.

SSgt Moody testified that Appellant repeated this version of events to the same first responders after TBN was taken to the hospital.  Another first responder, military police officer SSgt Robert Eugene Soli, testified that after hearing Appellant's version of events, he alerted United States Naval Criminal Investigative Service (NCIS) because in his opinion, "the injuries and the story [he] was being told didn't match up."

Later that day, upon questioning by a representative of the NCIS, Appellant changed the details of his story.  He stated that when he took TBN upstairs to take a bath, he placed TBN in the bathtub "on his buttocks, with his back facing the faucet, sitting in an upright position."  Appellant "turn[ed] the handle of the faucet to approximately the 9:00 position" and although he "did not plug the drain . . . some water was pooling in the bathtub."  After "check[ing] the water temperature approximately three times by touching the running water with [his] hand," Appellant "went to the vanity area of the bathroom where the sinks are to get soap," leaving TBN's side for approximately

4

"30-45 seconds." The vanity area was in an adjacent room separated by a doorway, but was within sight of the bathtub.

While searching for soap, Appellant heard TBN "whimper," and when he returned to the "tub area of the bathroom," TBN was squirming on his back and "appeared to be in visible pain and was screaming." Appellant lifted TBN from the tub and noticed that "the water was very hot," and that "the skin on his back and arms was peeling off." Appellant alerted his wife, then called 911. Appellant stated that this was only his second time bathing TBN, and the first time he had bathed him in that particular bathtub. As a result of TBN's exposure to scalding water, he sustained second- and third-degree burns on 35 percent of his body, including his scalp, neck, buttocks, back, and arms.

Appellant was charged with, inter alia, one specification of child endangerment for:

> endanger[ing] the physical health of [TBN] by leaving him unattended in a bathtub where hot water was running from the faucet, and that such conduct constituted culpable negligence which resulted in grievous bodily harm, to wit: 2nd degree burns on approximately 35% of his body, which conduct was of a nature to bring discredit upon the armed forces.

At trial, trial counsel offered the testimony of Dr. Michael Dickens Peck, who treated TBN for his injuries, to testify regarding the extent of TBN's burns. Dr. Peck testified that TBN was treated for fifty days at the Maricopa Burn Center,

undergoing seven surgeries to excise his burnt skin and receive skin grafts for his third-degree burns. He also offered his expert opinion on the possible cause of TBN's injuries, specifically, the water temperature and exposure time required to cause such burns. In particular, he stated that "for an adult, it takes ten minutes to get a third-degree burn at [exposure to water temperature of] 120 degrees." Dr. Peck opined that, generally, it takes less time to produce the same burns in children as compared to adults because "[t]heir skin isn't as thick . . . [so] it doesn't take as long to produce a burn." He also provided his expert opinion that it would not be possible for a ten-month-old child to sustain third-degree burns "when exposed to water at a temperature of 115 degrees for 30 to 45 seconds."

Trial counsel also called military police officer SSgt Moody to offer an opinion on whether Appellant's conduct was of a nature to bring discredit upon the armed forces. Defense counsel objected to the admission of SSgt Moody's testimony. They argued that SSgt Moody was offering improper lay opinion testimony because he was a Marine, not a civilian, and therefore was not "the appropriate party" to "offer[] an opinion as to what the public may ascertain." The military judge overruled the objection. He found that SSgt Moody's testimony was admissible because:

> it is rationally based upon his perception as a witness of being a Marine as well as a civilian. It would be helpful to the clear understanding, perhaps, of his testimony why he's offering such an opinion, and clearly it is not based on any scientific, technical, or other specialized knowledge other than his performance as a United States Marine.

On direct examination, trial counsel asked SSgt Moody, "[i]n your opinion, does a Marine who endangers the life of his child bring discredit on the Marine Corps?" SSgt Moody responded: "I would think somebody who did that would -- anybody who would do that would bring discredit upon themselves, but especially a Marine, because of the high opinion that we are -- I feel we are held to by the public, sir." SSgt Moody was the only Government witness who proffered an opinion on whether Appellant's conduct was service discrediting. Appellant was convicted by the panel members of child endangerment by culpable negligence.

On appeal, the CCA affirmed Appellant's conviction. Norman, 2014 CCA LEXIS 88, at *5-6, 2014 WL 656249, at *2. In its opinion, the CCA "assum[ed] error in admitting this lay opinion," without deciding the issue, because it ultimately held that the remaining evidence presented at trial was legally sufficient to support the conviction. This appeal followed.

## DISCUSSION

The elements of child endangerment, as stated in the Manual for Courts-Martial, are:

7

> (1) That the accused had a duty for the care of a certain child;
>
> (2) That the child was under the age of 16 years;
>
> (3) That the accused endangered the child's mental or physical health, safety, or welfare through design or culpable negligence; and
>
> (4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Manual for Courts-Martial, United States pt. IV, para. 68a.b (2012 ed.) (MCM).

The only element in contention in this case is the terminal element: whether the evidence at trial was legally sufficient to demonstrate that Appellant's conduct was of a nature to bring discredit upon the armed forces. We first address whether SSgt Moody's testimony was admitted in error, before discussing whether the evidence otherwise properly admitted at trial is legally sufficient to sustain Appellant's conviction.

I. Military Rule of Evidence 701

M.R.E. 701 governs the admissibility of opinion testimony by a lay witness. Under M.R.E. 701:

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences that are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based in scientific, technical, or other

>   specialized knowledge within the scope of Rule
>   702.[1]

"M.R.E. 701 establishes a two-part test for admissibility of lay opinion: (1) the opinion must be rationally based on the witness's perception; and (2) the opinion must be helpful to the determination of a fact in issue." United States v. Byrd, 60 M.J. 4, 6 (C.A.A.F. 2004). "It is generally held . . . that opinion testimony is not helpful where it does no more than instruct the factfinder as to what result it should reach." United States v. Littlewood, 53 M.J. 349, 353 (C.A.A.F. 2000) (citation omitted). This Court reviews a military judge's application of M.R.E. 701 for an abuse of discretion. Id.

Trial counsel sought to admit SSgt Moody's testimony in order to establish the terminal element. SSgt Moody testified on his view of the Marine Corps both before and after he joined the service, whether he believed that Marines "are held to a higher standard of conduct" by the public, and why "the opinion of the American public [is] important to a Marine." After

---

[1] Appellant argues that the Government is judicially estopped from arguing before this Court that SSgt Moody's testimony was properly admitted under M.R.E. 701 because the Government conceded this point in its brief to the CCA. See Brief of Appellee at 15-16, United States v. Norman, No. 201300152 (C.A.A.F. Nov. 10, 2014). Given this Court's conclusion that SSgt Moody's testimony was improperly admitted under M.R.E. 701, we need not reach this issue. Consequently, for the purposes of the following discussion, this Court assumes, without deciding, that the Government is not judicially estopped from arguing that SSgt Moody's testimony was properly admitted.

9

laying this foundation, SSgt Moody offered his opinion that "anybody" who "endangers the life of his child . . . would bring discredit upon themselves, but especially a Marine, because of the high opinion that we are -- I feel we are held to by the public." He provided no further elaboration.

This Court addressed a comparable scenario in Littlewood, 53 M.J. at 351. At issue in that case was whether the military judge erroneously permitted the accused's commander, a lieutenant colonel, to offer his lay opinion testimony that the accused's charged conduct was indecent and prejudicial to good order and discipline. Id. at 351-52. In Littlewood, during direct examination of the witness, trial counsel described various acts the accused was charged with having committed, then asked the witness to opine on whether such acts were indecent, prejudicial, or service discrediting. Id. at 351. Direct examination consisted of the following line of questioning, repeated for each Article 134, UCMJ, charge the accused faced:

> Q: If an adult were to perform oral sex on a 12-year-old girl or have a 12-year-old girl perform oral sex on him, would these acts be indecent?
>
> A: Yes, they would.
>
> Q: Prejudicial to good order and discipline?
>
> A: Yes, they would.
>
> Q: Would they bring discredit upon the Air Force?
>
> A: Yes, they would.

Id. at 351.  This Court concluded that the testimony was not helpful because it "consisted of bald assertions, unsupported by reasoning or particular facts showing the manner in which the charged offenses embarrassed the command or undermined its morale."  Id. at 353.

In the instant case, similar to Littlewood, SSgt Moody's lay opinion testimony essentially restated the terminal element. He offered no "reasoning or particular facts" as to his understanding of the concept of service discrediting conduct, or how he understood this concept as applied to Appellant's actions.  SSgt Moody's testimony regarding his perceptions of the Marine Corps may have established a rational basis for his opinion, but did not establish sufficient details to aid the factfinder in evaluating the service discredit element.

Indeed, the military judge overruled defense counsel's objection to SSgt Moody's testimony on the basis that his testimony "would be helpful to the clear understanding, . . . of . . . why he's offering such an opinion."  The military judge's explanation suggests that trial counsel's questions regarding SSgt Moody's background were helpful because they laid the foundation for SSgt Moody's opinion.  This reasoning goes to the first requirement in M.R.E. 701, that the witness provide a rational basis for his perceptions.  This rationale, however, does not articulate why the proferred testimony would be helpful

to the factfinder.[2]  Although a witness may offer an opinion on an ultimate issue, M.R.E. 704, offering this opinion without further explanation, as SSgt Moody did, is unlikely to be helpful to the trier of fact.  Restated, it is not clear why the testimony of a Marine military police officer, without more, would be helpful regarding a question of parenting practice, and whether such practice was service discrediting.  Like Littlewood, we find that the military judge abused his discretion in admitting the testimony of SSgt Moody.

Nevertheless, such error was harmless.  Article 59(a), UCMJ, 10 U.S.C. § 859(a).  This Court conducts de novo review of "[w]hether an error, constitutional or otherwise, was harmless." United States v. Hall, 66 M.J. 53, 54 (C.A.A.F. 2008) (citation omitted).  "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings."  Id.  This Court determines whether prejudice resulted from an erroneous "evidentiary ruling by weighing four factors:  '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in

---

[2] Even the military judge stated that he was "hesitant to frame [SSgt Moody's testimony] as a lay opinion testimony." Nevertheless, the military judge ultimately admitted the testimony, noting that it was being offered by the Government "in light of the need to put on some evidence to support a terminal element."

question.'" Id. (citing United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999)). In applying these four factors, we conclude that, by virtue of being conclusory and unhelpful to the trier of fact, SSgt Moody's testimony was not qualitatively significant, nor was it material to the Government's overall case. Moreover, the Government had a strong case notwithstanding this testimony: SSgt Moody's testimony only supported one element of the charged conduct which, as discussed below, was established by other evidence at trial. In applying the four Kerr factors, we conclude that three out of four factors weigh in the Government's favor. Accordingly, admission of SSgt Moody's testimony by the military judge was harmless error.

II. Legal Sufficiency

A. The Phillips Standard

Appellant argues that evidence demonstrating the charged conduct may not also be considered as proof of the service discredit element because this would be an unconstitutional presumptive conclusion. Brief of Appellant at 11, 13-14, United States v. Norman, No. 14-0524 (C.A.A.F. Oct. 10, 2014). Appellant reasons that absent the testimony of SSgt Moody, there is no independent evidence supporting the service discredit element, and consequently his conviction must be overturned. Id. at 7. We disagree.

In Phillips, this Court concluded that "proof of the conduct itself may be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces."  70 M.J. at 163.  Further, as discussed below, a factfinder may permissibly conclude that the same piece of evidence proves more than one element of a charged crime, so long as this conclusion is reached independently with respect to each element.

An unconstitutional presumptive conclusion arises when the military judge instructs members that they must conclude that evidence of the charged conduct also satisfies the terminal element.  Such an instruction is unconstitutional because it relieves the government of its burden of proof, "subvert[s] the presumption of innocence accorded to accused persons[,] and also invade[s] the truth-finding task assigned solely to juries in criminal cases."  Carella v. California, 491 U.S. 263, 265 (1989); see Morissette v. United States, 342 U.S. 246, 274 (1952) ("A conclusive presumption which testimony could not overthrow would effectively eliminate . . . an ingredient of the offense . . . . [which] would prejudge a conclusion which the jury should reach of its own volition."); see also Estelle v. McGuire, 502 U.S. 62, 78 (1991) (O'Connor, J., concurring in part and dissenting in part) ("[W]e have held that mandatory

presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of the offense."); Gov't of the Virgin Islands v. Parrilla, 7 F.3d 1097, 1106 (3d Cir. 1993) (noting that where jurors have been instructed to conclusively presume an element of the offense, the conviction may not stand because "an unconstitutional failure of proof of every element of the offense may result"); Tyler v. Phelps, 643 F.2d 1095, 1098 (5th Cir. 1981) ("Presumptions which act to preclude consideration of an element of the crime conflict with the presumption of innocence and invade the factfinding function of the jury.").

In this case, the military judge provided the members the standard instruction in the Military Judges' Benchbook verbatim, advising them that in order to convict Appellant, they must find "that under the circumstances the conduct of the accused was of a nature to bring discredit upon the armed forces." See Dep't of the Army, Pam. 27-9, Legal Services, Military Judges' Benchbook ch. 3, para. 3-68a-1 (2014). During oral argument, Appellant's counsel conceded that the military judge did not err in providing this instruction. Given that the members were properly instructed and may permissibly consider evidence of the charged conduct when evaluating the terminal element, excluding SSgt Moody's testimony, without more, does not necessitate reversing Appellant's conviction for lack of independent

evidence of the terminal element.  As a result, there was no unconstitutional presumptive conclusion because the military judge properly "instruct[ed] the members of the court as to the elements of the offense," and did not require them to find proof of the terminal element simply because the Government provided proof of the underlying conduct.  Article 51(c), UCMJ; Phillips, 70 M.J. at 166.

We now proceed to determine whether "all the facts and circumstances" of Appellant's charged conduct demonstrate that Appellant's conviction was legally sufficient.  Phillips, 70 M.J. at 165.

B.  The Jackson Standard

"This Court reviews the issue of legal sufficiency de novo," United States v. Oliver, 70 M.J. 64, 68 (C.A.A.F. 2011) (citing United States v. Green, 68 M.J. 266, 268 (C.A.A.F. 2010)), applying the standard set forth by the Supreme Court in Jackson, 443 U.S. at 319.  Under the Jackson standard, "in reviewing for legal sufficiency of the evidence, 'the relevant question' an appellate court must answer is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Oliver, 70 M.J. at 68 (C.A.A.F. 2011) (quoting Jackson, 443 U.S. at 319).

As this Court noted in United States v. Oliver, this standard "does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,' rather it requires that a reviewing court examine only whether 'any rational trier of fact' could have made that determination." Id. at 68 (quoting Jackson, 443 U.S. at 318-19). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," and "preserves 'the factfinder's role as weigher of the evidence.'" Id. (quoting Jackson, 443 U.S. at 319). In other words, this Court's decision "does not hinge on whether or how the parties' lists of circumstantial evidence or negating factors stack up against each other. Rather, it hinges on whether reasonable factfinders could have drawn inferences one way or the other under a given set of circumstances." Id. This Court evaluates whether there is an avenue through which a rational factfinder could find the essential elements of the crime.

C. The Jackson Standard Applied

Appellant originally told the first responder, SSgt Moody, that he had turned the faucet handle in the tub "to full cold," lowered his son into the water, and removed him from the tub shortly thereafter. Upon questioning by NCIS, Appellant later

told criminal investigators that he had turned the faucet handle to "approximately the 9:00 position," left the "tub area of the bathroom" and turned his attention away from TBN for 30 to 45 seconds, then returned, saw TBN "in visible pain and . . . screaming," and lifted him out of the tub.

The interplay of four pieces of evidence is at issue in determining "'whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Oliver</u>, 70 M.J. at 68 (quoting <u>Jackson</u>, 443 U.S. at 319).

First, at trial the Government established, through the testimony of Dr. Peck, that a person exposed to hot water would register "an almost instantaneous sensation of pain," and that "a child [would] scream when exposed to very hot water."

Second, the Government offered evidence demonstrating that TBN sustained second- and third-degree burns on 35 percent of his body.[3]

---

[3] TBN's injuries are relevant with respect to the service discredit element insofar as they shed light on Appellant's conduct. The extent of TBN's burns was a predicate fact assumed by Dr. Peck in order to provide his opinion on the range of temperatures and possible duration of TBN's exposure to the hot water. Accordingly, it is circumstantial evidence of the position of the faucet handle, and the length of time that TBN was left unattended in the bathtub. Notably, SSgt Soli first notified NCIS of Appellant's conduct when he observed that TBN's injuries were more severe than Appellant's initial account of

Third, at trial, the Government presented evidence of temperature readings conducted at Appellant's residence by NCIS. According to the readings and testimony by an NCIS agent, when the faucet handle was turned to the 9 o'clock position and left to run for 30 seconds, the water pooling in the center of the bathtub reached 115 degrees. The water coming directly out of the faucet at the 9 o'clock position was 115 degrees. When turned to the "10 to 11 o'clock position," the temperature of the water coming out of the faucet reached 122 degrees. When turned to the hottest position, almost 12 o'clock, the water in the center of the tub reached a temperature of approximately 133 to 137 degrees.

Finally, and significantly, Dr. Peck tied together TBN's burn injuries and the water temperature readings. Dr. Peck

---

events suggested. However, the extent of a child's injuries may not, in every instance, have any bearing on the conduct of the accused in a child endangerment case. This Court has recognized that an accused's culpably negligent conduct may be found service discrediting even where there is no harm to the child. See United States v. Vaughan, 58 M.J. 29, 36 (C.A.A.F. 2003); MCM pt. IV, paras. 68a.b.(4), 68a.c.(4) ("Actual physical or mental harm to the child is not required. The offense requires that the accused's actions reasonably could have caused physical or mental harm or suffering."). The converse also holds true: an accused's conduct may not be found service discrediting simply because a child has sustained a grievous injury if the accused's conduct is not prejudicial to good order and discipline or service discrediting. See MCM pt. IV, para. 68a.b. (2012 ed.) In the instant case, as noted, Dr. Peck relied on the extent of TBN's injuries to offer his expert opinion on the temperature of the hot water and TBN's exposure time to that water. Such evidence directly bears upon Appellant's conduct.

offered expert testimony on "the relationship between the temperature of a burning substance and time of exposure that it takes to create a third-degree burn," also known as a "full-thickness burn." He stated that he was basing his opinion on a 1940 study conducted on adult males, because there were no comparable studies on the burn rate of infants as "[i]t would be unethical" to "repeat these experiments in children." He nevertheless opined that, as a general matter, "it would take less time" to develop a burn on a child's skin "because the[ir] skin isn't [as] thick [so] it doesn't take as long to produce a burn that goes all the way through the skin." He stated that in order to determine "how long . . . someone ha[s] to be immersed in hot water before a third-degree burn occurs," he must first ascertain "how long they were in the water; . . . [and] how hot the water is." Dr. Peck testified that in adults, "as the water temperature goes much below 125 and certainly below 120 degrees, that the risk of getting a full-thickness burn diminishes greatly, because the amount [of time] that you have to be in the water goes up significantly."

Dr. Peck testified that at 115 degrees, which was the temperature of the water with the faucet handle at the 9 o'clock position, "clearly [exposure] is going to [need to last] much more than ten minutes" in order to produce a third-degree burn in an adult. He stated that "for an adult, it takes ten minutes

to get a third-degree burn at 120 degrees." He estimated that "30 seconds [of exposure] at 130 degrees in an adult [would] produce a full-thickness burn," but that he would assume "it would take less time [to develop a full-thickness burn] in a child because a child's skin is thinner." Dr. Peck was then asked, consistent with Appellant's version of events, "[w]ould it be possible, in your professional medical opinion, for [TBN] to suffer full thickness burns when exposed to water at a temperature of 115 degrees for 30 to 45 seconds?," to which Dr. Peck responded, "No."[4]

We review this evidence in the light most favorable to the Government, and only with a view to whether a rational factfinder could find that Appellant's conduct was service discrediting. In light of the preceding evidence, a rational trier of fact could have concluded that there were alternative explanations of Appellant's conduct, other than his statement, that were more credible and supported by scientific evidence. Having reached such a conclusion, a rational trier of fact could have then determined, extrapolating from Dr. Peck's testimony, that Appellant left TBN unattended in a tub of running hot water for a period of time that was longer than 30 to 45 seconds and

---

[4] A second Government witness, Dr. Kathryn Anne Coffman, an expert in child abuse pediatrics, further opined that TBN's exposure to running water at a temperature of 115 degrees was inconsistent with the extent of TBN's burns.

less than the ten minutes required for an adult male to receive comparable burns. A rational trier of fact could have instead determined that Appellant turned the faucet handle to the hottest setting and then left his child unattended for 30 to 45 seconds, disregarding TBN's cries when the hot water made contact with his skin. Considering these scenarios, the standard of review is critical. This Court must view "the evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Oliver, 70 M.J. at 68 (quoting Jackson, 443 U.S. at 319). In light of Dr. Peck's testimony, a rational trier of fact could conclude that the evidence proved that Appellant's actions were more than bad parenting, but amounted to culpable and criminal negligence, which was of a nature to discredit the armed forces.[5]

Moreover, a rational trier of fact could have further found this conduct service discrediting because Appellant was a

---

[5] Although we find the evidence here legally sufficient, the better practice would be for trial counsel to make its theory of discredit apparent during closing arguments. Here, trial counsel made no mention of the terminal element during closing arguments, omitting any mention of SSgt Moody's testimony or any other evidence supporting this element, leaving this Court to evaluate each piece of evidence post hoc, on the basis of a cold record. As the instant case demonstrates, enumerating the evidence during closing argument where material evidence is ultimately excluded, will not only clarify the record on appeal but will, surely, facilitate the members' deliberation.

sergeant of the Marine Corps.  A rational trier of fact could reason that the public would expect Appellant, a noncommissioned officer who had been selected and promoted to the rank of sergeant, to exhibit competence and responsibility toward someone in his care.  Consequently, Appellant's culpably negligent behavior would have "a tendency to bring the service into disrepute or . . . tend[] to lower it in public esteem." MCM pt. IV, para. 60.c.(3).  Accordingly, we affirm the CCA's decision.

CONCLUSION

We hold that Appellant's conviction for child endangerment by culpable negligence is legally sufficient.  The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.