UNITED STATES, Appellee,

v.

Arthur L. MORGAN, Corporal, U.S.
Marine Corps, Appellant.

No. 63,193.

NMCM 88 3838.

U.S. Court of Military Appeals.

Argued March 13, 1990.

Decided Sept. 7, 1990.

For Appellant: *Lieutenant Jacob R. Walker, JAGC, USNR* (argued); *Major Gregory S. Warner, USMC* (on brief); *Lieutenant Nicholas Fitzgerald, JAGC, USNR.*

For Appellee: *Lieutenant John J. Mulrooney II, JAGC, USNR* (argued); *Commander Thomas W. Osborne, JAGC, USN* (on brief).

*Opinion of the Court*

COX, Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members at Camp Pendleton, California, in March 1988. Contrary to his pleas, he was

convicted of forcible sodomy [1] on, and communicating indecent language to, a female under the age of 16, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively. Appellant was sentenced to confinement for 10 years, total forfeitures, reduction to E–1, and a dishonorable discharge. The convening authority approved the sentence, and the Court of Military Review affirmed in an unpublished opinion. We granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING A VIDEO-TAPE RECORDING OF STATEMENTS MADE BY THE ALLEGED VICTIM TO A SOCIAL WORKER.

## II

WHETHER THE RECORD DEMONSTRATES THE FOUR–YEAR–OLD WITNESS' INABILITY TO DISTINGUISH TRUTH FROM FALSITY AND TO UNDERSTAND THE MORAL IMPORTANCE OF TELLING THE TRUTH.

The charges arose from an alleged sexual assault by appellant on a 4–year–old girl at Camp Pendleton. Appellant and his family lived next door to the victim and her family in base housing. On the evening of October 1, 1987, appellant invited the victim and her mother, Mrs. M, over to his house for dinner with him and his three children. Appellant's wife was working that night, so she was not home. Mrs. M's husband, a lance corporal, was overseas on military assignment. The two couples apparently had been good friends, and the children often played together.

During opening argument, defense counsel announced the theory that Mrs. M had coached her child to fabricate the incident so that her husband would be brought home. Counsel informed the members that the victim's trial testimony would reveal such coaching. On closing argument, defense counsel reiterated this claim and also charged that the child's trial testimony was inconsistent with her Article 32, UCMJ, 10 USC § 832, testimony.

As the evidence on the merits revealed, at approximately 8:00 p.m. on the evening in question, Mrs. M was in appellant's kitchen talking on the phone. The victim was upstairs in the bathroom, and appellant was also upstairs. According to the child's testimony, appellant took her into his bedroom, got her on the bed, and took her clothes off. He then anally sodomized her ("He stuck his knobby in my butt"), and "he asked me to lick it and I said no." He warned her not to scream and threatened her if she told anyone. The child testified about her understanding of male and female genital areas, using anatomical dolls. At one point, however, she became confused, and it was necessary to call a recess.

During cross-examination, defense counsel sought to impeach her by pointing out alleged inconsistencies in her statements and by having her acknowledge that she had told the same "story over and over again."

Mrs. M testified that, upon returning home, she noticed her daughter was acting "kind of excited and kind of keyed up a little bit." When Mrs. M asked her why she was acting strangely, the victim replied that appellant had "stuck his knobby in her butt." [2] When Mrs. M asked her again, she began to cry. At that point, Mrs. M examined the child's anus and saw blood. She

---

1. The court-martial promulgating order, dated September 6, 1988, merely reflects that appellant committed sodomy on the victim (named but not otherwise described) on the date in question. This admits of the interpretation that the act may have been consensual and the victim an adult. While we are sympathetic with the desires of the services to minimize the administrative burdens of processing court-martial orders, *see* RCM 1114(c)(1), Manual for Courts–Martial, United States, 1984, we think the orders should at least indicate the true nature of the offenses.

2. This statement was admitted as an excited utterance.

immediately took her to the Camp Pendleton Naval Hospital; the following morning, they went to the San Diego Children's Hospital.

Defense counsel attempted to impeach Mrs. M on cross-examination with allegedly inconsistent prior statements regarding the injury to the victim's anus. He also attempted to develop the theme that Mrs. M had invented the molestation story in order to get her husband home.

The treating physician from the Naval hospital testified that the child's anus had been damaged. A pediatrician from the children's hospital concurred that the anal area had been significantly damaged.[3]

In light of the cross-examination of the victim, as well as that of Mrs. M, trial counsel offered, as a prior consistent statement, a videotaped interview between the child and a social worker from the San Diego Center for Child Protection. Mil.R. Evid. 801(d)(1)(B), Manual for Courts–Martial, United States, 1984. The interview occurred after Mrs. M first brought the matter to the attention of the authorities, but before the Article 32 hearing. Defense counsel objected on the ground that the videotape would not rebut the charge of coaching, in that the alleged motive to fabricate had already arisen prior to the initial complaint. *See United States v. McCaskey*, 30 MJ 188 (CMA 1990). In addition, counsel argued that the evidence would be cumulative. *See* Mil.R.Evid. 403.

Observing, *inter alia*, "that there are no time parameters in [Mil.R.Evid.] 801(d)(1)(B)," *but see United States v. McCaskey*, *supra*, and that "the nature and thrust of the cross-examination of the little girl standing alone is sufficient to bring these rules into play," the military judge overruled the objection and permitted the videotape to be played for the court members. Ultimately, the judge instructed the members that they could consider the videotape interview for its "tendency to refute

[the] suggestion of recent fabrication, improper influence, or improper motive" and for "the truth of the matters stated therein."

## I

■ Before this Court, appellate defense counsel contend that the videotaped interview was inadmissible because appellant was not given the opportunity to cross-examine the witness during the social worker's interview of the child. Therefore, in appellant's view, his right to confrontation under *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), was denied. In *Coy*, the victims testified in court, but behind a screen, so that they could not see the accused. *Coy* is inapposite to this case because this victim faced appellant in court, eyeball to eyeball. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)(right to confrontation not violated by admission of prior statement of witness who was subject to cross-examination at trial, but not subject to cross-examination at time of prior statement).

What is guaranteed is the *"opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985); *see also United States v. Owens*, 484 U.S. 554, 558, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988); *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987). In this case, appellant had ample opportunity to cross-examine the witness. *Cf. United States v. Quick*, 26 MJ 460 (CMA 1988). The circumstances giving rise to the Supreme Court's concerns in *Coy* and other confrontation cases were simply not present here.

■ Appellant further contends that the videotaped interview was inadmissible under the Military Rules of Evidence. A pri-

---

**3.** In addition, a child psychologist, who treated the child, testified that the child exhibited symptoms characteristic of a child who had been sexually molested. Among other things, she demonstrated sexual contact between a male doll and female doll and told the psychologist appellant "was mean and that's what had happened."

or, out-of-court statement, made by a person who testifies at trial, is admissible if it is "consistent with the declarant's testimony and is offered to rebut an *express or implied* charge against the declarant of *recent fabrication* or *improper influence or motive.*" Mil.R.Evid. 801(d)(1)(B) (emphasis added). *See also* Fed.R.Evid. 801(d)(1)(B).[4] In a sense, admissibility of such declarations is "a matter of choice by the party opposed to the witness," who "may 'open the door' to the use of such statements by engaging in a particular kind of impeachment, or leave the door shut by refraining." D. Louisell and C. Mueller, *Federal Evidence* § 420 at 187 (1980) (footnote omitted).

Although defense counsel contended he was implying only that the child had been coached from the beginning, he actually raised two separate theories through his cross-examination of mother and child and his argument. The first was that the girl had been coached to fabricate the incident, so as to accomplish the return of her father from an overseas assignment. The second was that her trial testimony did not even agree with that given at the Article 32 hearing.[5]

By seeking to impeach the victim with allegedly inconsistent Article 32 testimony, and by stressing that she had told her story "over and over again," counsel raised the spectre that improper influence had occurred after the Article 32 hearing. Indeed, arguably, the spectre continued through trial on the merits, because it became necessary at one point to call a recess for the girl, and she might have received further instruction then from her mother, who was with her in the courtroom.

In resolving this case, we adhere to the view expressed in *United States v. McCaskey, supra,* that Mil.R.Evid. 801(d)(1)(B) "generally was intended to be limited to prior consistent statements made before the alleged recent fabrication or improper influence or motive occurred." 30 MJ at 192 (footnote omitted). Here, defense counsel threw down the gauntlet at the outset and charged that the accusations were deliberately falsified from the beginning and that the Government's most damning witness was coached throughout. Additionally, however, defense counsel quite clearly charged fabrication since the testimony at the Article 32 hearing. Under these circumstances, we are satisfied, at a minimum, that the interview that occurred prior to the Article 32 hearing adequately rebutted the implication of the most recent fabrication and influence, and it was thus admissible.[6]

## II

■ The second issue relates to the competence of the victim as a witness. Before

4. Mil.R.Evid. 801(d)(1)(B) is taken verbatim from the Fed.R.Evid. and

> makes admissible on the merits a statement consistent with the in-court testimony of the witness and "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Unlike Rule 801(d)(1)(A), the earlier consistent statement need not have been made under oath or at any type of proceeding. On its face, the Rule does not require that the consistent statement offered have been made prior to the time the improper influence or motive arose or prior to the alleged recent fabrication.

Drafter's Analysis, Manual for Courts–Martial, United States, 1984, at A22–47 (Change 2).

5. Actually, the two theories appear to be contradictory. In the first one, counsel is effectively asserting that the child should not be believed because her testimony was too smooth and consistent. In the second, he suggests that she should not be believed because her testimony was so inconsistent.

6. Ironically, if coaching or improper influence occurred, the videotape of the interview should have been the defense's best evidence of it. The methods and approach of the social worker were totally different from those of counsel at trial; the members could readily assess how well the 4–year–old's story was holding together under the various techniques and after a 5–month hiatus. We assume trial counsel would not have been so eager to offer the videotape if it depicted the victim as being coached, *i.e.,* telling the same story over and over again, in the same order, with the same gestures, inflections, vocabulary, etc. Still, trial counsel ran the risk that this is what the members might have decided. We can think of few media more effective than videotape for allowing the members to answer this question in their own minds.

the victim was allowed to testify, trial counsel administered the following "oath," in front of the court members:

> TC: I want you to stand right here, ... and I want you to face me. Okay now. I want you to look at me, all right? Are you looking at me?
>
> WITNESS: Witness nodded her head in the affirmative.
>
> TC: Can you raise your right hand?
>
> WITNESS: Witness raised her left hand.
>
> TC: Raise your other hand.
>
> WITNESS: Witness did as requested.
>
> TC: Okay. Now ..., like I told you the last time, when you're in the presence of adults and you raise your right hand, that means you have to tell the truth. Okay?
>
> WITNESS: No response.
>
> MJ: ... [said the child's name]?
>
> TC: ... [said the child's name]?
>
> WITNESS: Witness nodded her head in the affirmative and muttered "yes."
>
> TC: You're going to have to speak up now.
>
> MJ: Just a minute...., sit down. That a girl.
>
> TC: Okay. Now ..., it's not raining—if I said it was raining, would I be telling the truth?
>
> WITNESS: No response.
>
> TC: It's not raining in here, is it?
>
> WITNESS: Witness shook her head "No."
>
> TC: Okay. Now do you promise us to tell the truth today?
>
> WITNESS: Witness nodded her head in the affirmative.
>
> TC: And when little girls tell lies, is that bad?
>
> WITNESS: Witness nodded her head in the affirmative.

> TC: And do little girls get punished when they tell lies?
>
> WITNESS Witness nodded her head in the affirmative.
>
> TC: And you promise us to tell the truth today?
>
> WITNESS: Witness nodded her head in the affirmative.

Mil.R.Evid. 601 provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." Further, the rules of evidence state:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully, by *oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.*

Mil.R.Evid. 603 (emphasis added).

The trend in Federal civilian courts [7] and military justice is to let "all witnesses ... testify," in order "to provide court-members with the greatest amount of arguably reliable evidence possible, with the expectation that court-members can decide the appropriate weight to be given imperfect witnesses." S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 492 (2d ed. 1986). Mil.R.Evid. 603 "is written to permit atheists, conscientious objectors, *children* and individuals with emotional difficulties to satisfy the basic criterion" of affirming their duty to tell the truth. *Id.* at 498 (emphasis added).

We have never suggested that children might be incompetent to testify based on some general inability to understand an oath or affirmation to tell the truth.[8] Certainly there is nothing in this record to cause us to reverse this course with respect to child witnesses in sexual-abuse cases. *See* J. Myers, *Child Witness Law and Practice* §§ 3.17–3.19 at 93–99 (1987).

---

**7.** *See United States v. Lightly,* 677 F.2d 1027, 1028 (4th Cir.1982) (witness competent to testify, even though found criminally insane and suffering from hallucinations, when psychiatrist established witness "had a sufficient memory" and "understood" obligation to tell the truth).

**8.** *See United States v. LeMere,* 16 MJ 682, 685–86 (ACMR 1983), where the United States Army Court of Military Review found that a 3–year-old witness demonstrated the capacity to testify to what she understood to be the truth; any subsequent confusion by the child as to truth and fantasy went to the weight of

The colloquy between the child, trial counsel, and the military judge more than sufficiently demonstrates that the witness knew the difference between truth and falsity, and that she intended to tell the truth. Appellant's complaint that her affirmative responses were predominantly nods of the head rather than verbal responses is without merit, where the court reporter meticulously documented the gestures.[9] It does not strike us as surprising that a 4–year–old might experience hesitancy and apprehension at the prospect of speaking before a room full of adults, including her assailant. It was a matter for the members, who heard and observed her, to decide what weight would be given to her testimony. As for the propriety of her testifying, the military judge correctly determined that she was competent.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.

9. Witnesses of all ages sometimes respond by nodding or shaking the head. As long as the court reporter accurately reflects the gesture in the record, the record is adequate, even though it would be better if witnesses would always respond verbally. In the case of young children, even more tolerance may be necessary. This should not be surprising or unduly burdensome.