# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

### No. 201500199

_____

### UNITED STATES OF AMERICA
Appellee

v.

### JESUS I. GALLARDO
Corporal (E-4), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Eugene H. Robinson, Jr., USMC.
For Appellant: Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Lieutenant Commander Jeremy R. Brooks, JAGC;
USN; Major Suzanne M. Dempsey, USMC.

_____

Decided 29 September 2016

_____

Before MARKS, FULTON, AND GLASER-ALLEN, _Appellate Military Judges_

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

MARKS, Senior Judge:

A panel of members with enlisted representation, sitting as a general court-martial, convicted the appellant, contrary to his plea, of one specification of sexual assault of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b (2012).[1]  He was acquitted

---

[1] The members found the appellant guilty by exceptions and substitutions, excepting "divers occasions between on or about 25 February 2013 and 17 May 2013" and substituting therefor "single occasion between 1200, 16 May 2013 and 1200, 17 May 2013." Appellate Exhibit (AE) CX. He was found not guilty of the excepted words and figures and guilty of the substituted words and figures.

of a second specification of sexual assault of a child and a specification of sexual abuse of a child. The members sentenced the appellant to 16 years' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged and executed all but the discharge.

The appellant asserts three assignments of error: (1) the military judge abused his discretion by admitting recordings of forensic interviews of the victim, SA, as prior consistent statements; (2) the findings and sentence are not supported by legally and factually sufficient evidence; and (3) the military judge abused his discretion in denying the defense's requests for an expert psychologist after defense counsel presented evidence that the contents of SA's testimony were the product of suggestibility to improper influences.

We disagree with all three assignments of error. The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In May 2013, SA was five years old living in family housing on board Marine Corps Base Camp Pendleton, California, with the appellant, who was her stepfather, her mother, her maternal grandmother, her maternal grandmother's boyfriend, and her infant half-brother.

Earlier that same year, SA's behavior had changed. She began sleeping in pants instead of pajamas, asking to shower with the bathroom door locked, and distancing herself from her stepfather. The normally outgoing child withdrew from classroom activities and her classmates, and demonstrated anger at school.

On the night of 12 or 13 May 2013, her mother discovered the appellant sleeping with SA in SA's bed. SA's mother woke the appellant, and he jumped out of the bed. She noticed he was sweating and felt his heart racing, but he did not have an erection. SA's mother told him never to enter SA's room again after her bedtime. Concerned and suspicious, SA's mother approached SA the next day, attempting to elicit whether anyone had touched her. SA repeatedly denied any harm.

A few days later, on 16 May 2013, SA's mother again found the appellant asleep in SA's bed. She again woke him and they returned to their bedroom. Before dawn, SA's grandmother awoke to a noise, opened her bedroom door to investigate, and found the appellant in the hallway. Within hours, the appellant woke SA for school, they began their normal morning routine, and SA started to leave for school with her grandmother.

2

SA and her grandmother never left the front porch. Instead, SA disclosed to her grandmother, "[m]y daddy touched my coocoo."[2] "Coocoo" was SA's word for her genitals. SA's mother testified that 10 to 15 minutes passed before SA's grandmother re-entered the house to alert her to SA's revelation. SA's mother called the appellant and lured him home on the pretense that their infant son was in distress. Then she called law enforcement. The appellant called back and twice asked, "[a]re you sure it's not nothing to do with SA?"[3] As he was being arrested, the appellant repeatedly cried, "I don't know what's wrong with me."[4]

The appellant's inner turmoil remained apparent later that night during a recorded interrogation with Naval Criminal Investigative Service (NCIS). Although he made admissions, he never confessed to sexual abuse of SA. In his most incriminating exchange with NCIS, the appellant admitted that something happened the previous night but refused to say more for fear of never seeing his family again:

> [NCIS Agent]: So tell us the truth about what happened. How many times has it happened?
>
> [Appellant]: Just last night, sir.
>
> [NCIS Agent]: What happened last night?
>
> [Appellant]: I just . . . if I tell you this, I'm not going to be able to see them anymore. . . .[5]

The appellant voiced his struggle to maintain his relationship with his family while wrestling with a problem he would not name. He readily admitted to sleeping in SA's bed with her and eventually admitted to "cuddling" with her.[6] Cuddling consisted of hugging her and draping his arm around her waist while they slept. He repeatedly claimed not to remember anything other than falling asleep and mentioned recently waking up in strange places, from a baseball field near his home to the couch downstairs. Without supplying any specifics, he admitted something was wrong with him and requested the help of a psychiatrist and a chaplain.

Earlier that day, 17 May 2013, SA had been forensically interviewed. During the recorded interview, SA alleged that the appellant digitally penetrated her. The pediatrician who then examined SA detected abrasions

---

[2] Record at 725.

[3] *Id.* at 762.

[4] *Id.* at 764.

[5] *Id.* at 927-28; Prosecution Exhibit (PE) 21.

[6] Record at 942; PE 21.

and broken blood vessels around her vagina that were consistent with digital penetration but deemed nonspecific. Forensic testing of swabs of SA's genital area later revealed DNA consistent with the appellant's DNA profile. The inner lining of a pair of SA's underwear also contained DNA consistent with the appellant's DNA profile and tested positive for seminal fluid, but not sperm.

Within a few weeks, SA disclosed that the appellant had also penetrated her vagina with his penis. This new information prompted a second recorded forensic interview on 11 June 2013. When asked why she had withheld this allegation in her initial interview, SA insisted she had not forgotten but had been too afraid to tell.

Subsequently, SA's mother began to suspect the grandmother of framing the appellant, accusations SA's mother memorialized in an affidavit presented to trial counsel on 12 September 2013. At trial, SA's mother testified about the grandmother's motives and opportunity to plant such allegations against the appellant, including disapproval of the mother's marriage to the appellant, the grandmother's concerns about the appellant's plan to travel to Texas with the newborn son, SA's repeated denials when the mother asked her if anyone touched her inappropriately, confrontations between the mother and the grandmother about the grandmother's mental health, the length of time the grandmother was alone with SA during her initial front porch disclosure, the grandmother's insistence on private hour-long conversations with SA before interviews, and the grandmother's use of a baby monitor to eavesdrop on a conversation between SA and a counselor. However, when trial defense counsel confronted SA's mother at trial about her accusation, she attempted to retract it: "I didn't mean to say it that way at all. . . . But the way my mom was acting was as if she was suspicious of, you know, hiding something."[7]

## II. DISCUSSION

### A. Prior consistent statements

The appellant challenges the military judge's admission of the two recorded forensic interviews of SA into evidence as prior consistent statements.

A military judge's decision to admit evidence is reviewed for abuse of discretion. *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998).

A witness's prior, out-of-court statement is normally hearsay and therefore inadmissible. But if counsel attempts to impeach a witness with allegations of recent fabrication or improper influence or motive, a prior

---

[7] *Id.* at 790.

statement consistent with the witness's testimony may become admissible to rebut the allegation. A declarant-witness's prior statement is not hearsay when:

> [t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying[.]

MILITARY RULE OF EVIDENCE (MIL. R. EVID.) (801(d)(1)(B), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Factfinders may consider a prior consistent statement properly admitted under MIL. R. EVID. 801(d)(1)(B) as substantive evidence. *Tome v. United States,* 513 U.S. 150, 162-63 (1995).

Whether a witness's prior consistent statement is admissible under MIL. R. EVID. 801(d)(1)(B) depends on the specific fabrication or influence alleged. "In a sense, admissibility of such declarations is 'a matter of choice by the party opposed to the witness,' who 'may "open the door" to the use of such statements by engaging in a particular kind of impeachment, or leave the door shut by refraining.'" *United States v. Morgan*, 31 M.J. 43, 46 (C.M.A. 1990) (quoting D. LOUISELL AND C. MUELLER, *FEDERAL EVIDENCE* § 420 at 187 (1980) (footnote omitted)). If an opposing party points to an event giving rise to a motive to fabricate or a conversation in which someone exerted improper influence, that party may open the door to consistent statements *preceding* that event or conversation. Consistent statements uttered prior to a potentially corrupting motive or influence may rebut the alleged corruption and thus become admissible to rebut it. *See United States v. McCaskey*, 30 M.J. 188, 192 (C.M.A. 1990) ("[T]he prior statement typically must have been made *before* the point at which the story was fabricated or the improper influence or motive arose."). But when an opposing party alleges multiple motives to fabricate or multiple improper influences, a prior consistent statement need not precede *all* motives or influences, only the one it is offered to rebut. *Allison*, 49 M.J. at 57.

In this case, trial counsel sought admission of SA's two recorded forensic interviews as prior consistent statements rebutting trial defense counsel's charges of improper influence of SA. Trial defense counsel objected, arguing that the improper influence preceded both forensic interviews. The military judge acknowledged trial defense counsel's theory that SA's mother and grandmother began influencing SA before her first forensic interview, but he pointed to trial defense counsel's charges of improper influence after both interviews. Specifically, he concluded:

that at least one such charge of improper influence, whether discussions with [SA]'s mother or meetings behind closed doors with [SA]'s grandmother, arose after the 17 May 2013 forensic interview. Further, at least one such charge of improper influence, whether interviews with members of the prosecution team or more closed door discussions with grandmother, arose after the 11 June 2013 forensic interview.[8]

The military judge did not pinpoint the instances of potential improper influence with dates on a timeline, but it is possible to construct the sequence of events from the record. In his opening statement, trial defense counsel previewed multiple, continuing improper influences on SA:

[S]he's been infected by a number of people in her life, both before and after these allegations arose. People who talked repeatedly about these allegations: Her grandmother, his mother-in-law, her own mother, NCIS agents, her teachers, social workers, counselors, and a number of times with the prosecutors in this case in preparation for her testimony.[9]

SA's mother did not accompany SA to her initial forensic interview on 17 May 2013, but testified about the many interviews and conversations that followed. On at least one occasion between 17 May and 12 September 2013 a school counselor came to the home to talk to SA, and her grandmother eavesdropped on the conversation using a baby monitor. SA's mother confirmed that the grandmother took SA aside before interviews and spoke to her alone for an hour. SA's grandmother talked about the case against the appellant "constantly" in front of SA.[10] SA's mother testified about how she felt one of the NCIS agents "put too much pressure" on SA when talking to her about the case.[11] While the dates of these interviews and conversations are not clear, the 17 May 2013 forensic interview preceded them all.

In the months before the court-martial, trial counsel and at least one NCIS agent prepared SA for trial. By December 2014, SA was anxious about the court-martial, asking her mother when the case would be over and admitting she didn't know who touched her. In January 2015, trial counsel and an NCIS agent visited SA and her mother at their new home. According to the mother's testimony, she and SA arrived at Camp Pendleton for pretrial preparation on Wednesday, 4 February 2015. SA acknowledged that she

---

[8] AE CVI at 3.

[9] Record at 615.

[10] *Id.* at 791.

[11] *Id.* at 771.

spoke to trial counsel and her victim's legal counsel and watched the recordings of her forensic interviews in the days between 4 February and the day she testified, 10 February. SA agreed with trial defense counsel that the videos and conversations helped her remember what she had forgotten. Both forensic interviews, recorded 17 May and 11 June 2013, preceded SA's conversations with trial counsel, NCIS, and her victim's legal counsel in January and February 2015.

Although his findings of fact did not explicitly cite dates, the military judge focused his legal analysis on "the timing of both statements sought to be admitted and of the charge of improper influence."[12] He was correct to focus on the timing of these statements, and the record supports his finding that the forensic interviews predated multiple instances of alleged improper influence.

The appellant disputes the existence of multiple instances of improper influence, arguing instead that each instance merely repeated and perpetuated the grandmother's original improper influence. This argument has failed before the Court of Appeals for the Armed Forces (CAAF) in cases with similar facts. In *Morgan*, the case on which the military judge *sub judice* relied, trial defense counsel suggested that the victim's mother planted allegations in her daughter's mind to secure her husband's early return from an overseas assignment. 31 M.J. at 44. During cross-examination, trial defense counsel impeached the child victim with inconsistent statements from her Article 32, UCMJ, testimony and her acknowledgment that "she had told the same 'story over and over again.'" *Id*. Citing the cross-examination, the military judge admitted a video recording of her forensic interview into evidence under MIL. R. EVID. 801(d)(1)(B). *Id*. at 45. Trial defense counsel argued that the recorded forensic interview did not rebut the allegation that the victim's mother coached her to make the initial claim of sexual abuse. *Id*. at 45, 46. The Court of Military Appeals (CMA) differentiated Morgan's allegations of improper influence:

> Although defense counsel contended he was implying only that the child had been coached from the beginning, he actually raised two separate theories through his cross-examination of mother and child and his argument. The first was that the girl had been coached to fabricate the incident, so as to accomplish the return of her father from an overseas assignment. The second was that her trial testimony did not even agree with that given at the Article 32 hearing.

---

[12] AE CVI at 1.

*Id.* at 46. Finding that the forensic interview predated, and therefore could rebut, allegations of improper influence since the Article 32 hearing, the CMA affirmed its admissibility as a prior consistent statement. *Id. See also Allison*, 49 M.J. at 57-58 (The CAAF affirmed admission of the victim's recorded forensic interview as a prior consistent statement to rebut allegations that an Army Criminal Investigative Division agent, trial counsel, and others coached and influenced the child victim from an early interview through trial.) As in *Morgan*, there was a material change in SA's account of her sexual abuse. And the allegations that investigators, counsel, and others repeatedly rehashed SA's claim with her also align with the facts in *Morgan* and *Allison*.

We find that the military judge did not abuse his discretion by admitting the two forensic interviews of SA as prior consistent statements pursuant to MIL. R. EVID. 801(d)(1)(B).

## B. Legal and factual sufficiency

The appellant contests the legal and factual sufficiency of the evidence supporting his conviction for sexual assault of a child.

Article 66(c), UCMJ, requires us to review issues of legal and factual sufficiency *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). "The test for the former is whether, considering the evidence in the light most favorable to the prosecution, *a reasonable factfinder* could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis added). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves "convinced of the accused's guilt beyond a reasonable doubt." *Id.*. at 325. "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

We find the evidence legally and factually sufficient to support the appellant's conviction for digitally penetrating his stepdaughter, SA, on 16 or 17 May 2013. In her 17 May forensic interview, SA articulated the essential elements of rape of a child. Evidence of injury to SA's genitals plus the presence of the appellant's DNA there and on the lining of her underwear corroborate her allegations. SA's behavioral changes, the mother's repeated discovery of the appellant in bed with SA, testimony about his reaction to his arrest, and his recorded admissions to NCIS also support SA's claim. We considered evidence of the grandmother's possible motives and extensive

opportunities to influence SA, including the mother's testimony about delivering a notarized letter to trial counsel in September 2013 with her suspicions that the grandmother may have "set [the appellant] up."[13] However, the detail in SA's account and physical evidence implicating the appellant weigh against such a theory. Weighing all of the evidence, while considering our inability to personally observe the witnesses, we find no merit in this assignment of error.

## C. Expert psychological testimony as to suggestibility

Last, the appellant avers the military judge abused his discretion in denying a motion to compel production of an expert psychologist to explain how SA's testimony could be the product of suggestibility.

We review a military judge's decision to deny a request for an expert for an abuse of discretion and will overturn it only "if the findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law." *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (citations omitted).

It is well-established in case law that, "as a matter of military due process, servicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense, without regard to indigency." *United States v. Garries*, 22 M.J. 288, 290 (C.M.A. 1986) (citations omitted). RULE FOR COURTS-MARTIAL 703(b)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) entitles an accused to "the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary." MIL. R. EVID. 706 extends that entitlement to expert witnesses and requires that "[t]he trial counsel, the defense counsel, and the court-martial have equal opportunity to obtain expert witnesses under Article 46[14] and R.C.M. 703."

To claim this entitlement, an accused must first demonstrate the necessity of the expert assistance. *Garries*, 22 M.J. at 291. "'[A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.'" *United States v. Robinson*, 39 M.J. 88, 89 (C.M.A. 1994) (citing *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987), *cert.*

---

[13] Record at 790.

[14] Article 46, UCMJ, establishes the equal opportunity to obtain witnesses and other evidence: "The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. . . ."

*denied*, 481 U.S. 1054 (1987) (footnotes omitted). Courts also evaluate an accused's demonstration of necessity in light of three factors: "'First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop.'" *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994) (quoting *United States v. Allen*, 31 M.J. 572, 623 (N.M.C.M.R. 1990), *aff'd* 33 M.J. 209 (C.M.A. 1991), *cert. denied*, 503 U.S. 936 (1992)); *see also United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008) (citing *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005)).

The appellant argued that expert assistance was necessary to challenge the authenticity of SA's claim given her age, her presumed suggestibility, and evidence of the influence of her grandmother. When trial defense counsel first litigated the motion, they offered no testimony or evidence from their prospective expert but rather only referenced his dispositive testimony before courts-martial in the same judicial circuit.

In his initial ruling on the motion, the military judge found that the defense had not demonstrated that they required the assistance of an expert forensic psychologist. They had presented no evidence that suggestibility was a matter of such scientific, technical, or other specialized knowledge that an expert was necessary to understand it. The military judge noted that trial defense counsel had not interviewed the forensic interviewer or presented anything to rebut his conclusion that counsel "already possesse[d] the tools necessary to adequately gather and present evidence which would allow them to attack seven-year old [SA]'s testimony . . . ."[15]

At a later Article 39(a) session, the appellant's preferred expert on suggestibility testified. The expert explained how a child can become susceptible to the suggestion of sexual abuse. He answered trial defense counsel's question as to why counsel couldn't address these issues himself:

> . . . [B]ecause you need to go to graduate school and spend a couple years studying developmental psychology. It's not just simple stuff. There are many different protocols for interviewing children. . . . [Y]ou have to take a look at the child's sex abuse accommodation syndrome . . . You have to take a look at . . . the suggestibility features of the child and maturity and the psychopathology of the child. . . .[16]

The military judge made additional findings of fact, summarizing the psychologist's testimony as follows: "[S]cientific research and data establish

---

[15] AE LXII at 7.

[16] Record at 422-23.

that children, especially those of tender years, are highly susceptible to suggestibility. As such, their testimony can be contaminated due to any number of reasons, including interviewers['] improper questioning and suspicious parents repeatedly asking a child about abuse."[17] However, the military judge claimed to have heard nothing new in the psychologist's testimony. Adopting and incorporating the statement of law from his first ruling, the military judge concluded: "The expert's professional opinions/conclusions that the jurors need to understand the science of false confessions and suggestibility of children does not warrant the Court's reversal of the prior rulings on this matters [sic]."[18] He went on to find that "[w]hile the expert assistance may be relevant, the expert assistance is not necessary. . . . Denial of the expert assistance in this case will not result in a fundamentally unfair trial."[19]

To find that the military judge abused his discretion by denying trial defense counsel the assistance of this expert psychologist, we must conclude that the military judge relied on a misstatement of the law or a clearly erroneous finding of fact. Our review of the record reveals that the military judge correctly recited the applicable law and applied it without introducing legal error. "'[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range.'" *Freeman*, 65 M.J. at 453 (quoting *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004)). In *Freeman*, trial defense counsel requested an expert "with a specialty in police interrogation techniques," asserting that they could not challenge their client's interrogation as comprehensively and skillfully as an expert could. *Id*. at 457-59. Accepting *arguendo* the consultant's expertise and potential benefit to trial defense counsel, the CAAF still found that, "[t]hey failed to establish why they were unable to gather the relevant information and cross-examine the investigators on their interrogation techniques and their use of those techniques in eliciting a confession." *Id*. at 459.[20]

---

[17] AE XCIV at 2.

[18] *Id*. at 3.

[19] *Id*. at 4.

[20] On the other hand, the CAAF has found abuse of discretion when a military judge denies an accused an expert comparable to the one on which the Government's case relies. *See United States v. Lee*, 64 M.J. 213 (C.A.A.F. 2006). In *Lee*, the Government's case relied on an expert witness's interpretation of forensic testing of computer images. 64 M.J. at 217. In light of the Government's need for an expert and the criticality of "scientific analysis and expert testimony" to its case, fundamental fairness dictated the accused needed an expert as well:

In this case, trial defense counsel simply desired the superior experience and skill of an expert to dissect and potentially discredit SA's forensic interviews and testimony. The Government did not introduce an expert witness to testify to SA's suggestibility, or lack thereof, nor did they proffer the social worker who conducted both forensic interviews as an expert in her field. Undoubtedly, an expert would have bolstered trial defense counsel's efforts to sow doubt through suggestibility, but they failed to present evidence that undermined the military judge's assessment of their skills and resources relative to the issue of suggestibility. Their preferred expert made a case for education and experience equipping a professional to evaluate children with an increasingly nuanced eye and ear. But he did not controvert the military judge's original conclusion that trial defense counsel could effectively cross-examine SA, her mother, and her grandmother and reveal evidence of potentially improper influence.

Assuming *arguendo* that the military judge erred in denying the expert assistance, any error was harmless. Trial defense counsel effectively cross-examined SA and her mother on lapses in SA's memory, the mother's concerns about suggestibility, and the multiple occasions on which SA heard adults talking about her allegations against the appellant, including in the days before trial. Ultimately, the members' findings reflect their reasonable doubt as to much of what SA alleged. The appellant was convicted of a single incident of digital penetration, arguably what he admitted to in his NCIS interrogation.

The military judge's findings of fact were not clearly erroneous, and his conclusions that trial defense counsel had not demonstrated the necessity of their requested expert witness betrayed no abuse of discretion.

---

Where the Government has found it necessary to grant itself an expert and present expert forensic analysis often involving novel or complex scientific disciplines, fundamental fairness compels the military judge to be vigilant to ensure that an accused is not disadvantaged by a lack of resources and denied necessary expert assistance in the preparation or presentation of his defense.

*Id.* at 218.

### III.CONCLUSION

The findings and the sentence are affirmed.

Judge FULTON and Judge GLASER-ALLEN concur.

For the Court



R.H. TROIDL
Clerk of Court