# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39797**

———————————

**UNITED STATES**
*Appellee*

v.

**Daniel A. BENCH**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 24 May 2021

———————————

*Military Judge:* Charles G. Warren.

*Approved sentence:* Dishonorable discharge, confinement for 12 years, forfeiture of all pay and allowances, and reduction to E-4. Sentence adjudged 17 May 2019 by GCM convened at Whiteman Air Force Base, Missouri.

*For Appellant:* Major Rodrigo M. Caruço, USAF; Major Alexander A. Navarro, USAF; Joshua R. Traeger, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF: Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, RAMÍREZ, and CADOTTE, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

RAMÍREZ, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one charge and two specifications of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b,[1,2] and one charge and specification of indecent conduct in violation of Article 134, UCMJ, 10 U.S.C. § 934.[3] The members sentenced Appellant to a dishonorable discharge, confinement for 12 years, forfeiture of all pay and allowances, and reduction to the grade of E-4. The convening authority approved the adjudged sentence.

On appeal, Appellant raises five assignments of error: (1) whether the military judge erred when he admitted statements of a minor child to a therapist; (2) whether Specification 3 of Charge I (alleging sexual abuse of BC) is factually and legally sufficient; (3) whether the record sufficiently demonstrates compliance with Mil. R. Evid. 603 for one child witness, EC; (4) whether the Specification of Charge II (alleging indecent conduct) is factually and legally sufficient; and (5) whether the sentence is unduly severe. As we rely on the same law and standard for issues (2) and (4), we combine the issues into one analysis. We also consider facially unreasonable appellate delay as this opinion was released more than 18 months after docketing.

Finding no error materially prejudicial to Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant enlisted in the United States Army in January 1997, separated in 2001, then enlisted in the Air Force the same year. In 2006, while assigned

---

[1] References to the Uniform Code of Military Justice (UCMJ), Military Rules of Evidence, and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.). We note that one of the two specifications alleged sexual abuse of a child committed before the elements, definitions, sample specifications, and maximum punishments for Article 120b, UCMJ, offenses were promulgated by the President in Executive Order 13,740 on 16 September 2016. *See* 81 Fed. Reg. 65175, 65229–246 (22 Sep. 2016). For this Article 120b offense that was committed before Executive Order 13,740 was promulgated, Specification 3 of Charge I, this opinion will reference the *Manual for Courts-Martial, United States*, pt. IV, ¶ 45b (2012 ed.) (2012 *MCM*).

[2] Appellant was acquitted of one specification of sexual abuse of a child.

[3] Appellant was charged with committing indecent conduct under the general article provisions of Article 134, UCMJ. *See* 2012 *MCM*, pt. IV, ¶ 60.

to the 360th Recruiting Squadron in Utah, Appellant married MC.[4] MC was assigned to Hill Air Force Base. Appellant already had a daughter from a previous relationship, GG. In 2010, MC gave birth to fraternal twins, a girl and a boy, BC and EC.[5] Three years later, MC and Appellant separated, then divorced in 2014. At that point, they shared joint legal custody of the twins, and the twins stayed with Appellant every other weekend and one night during the week. This custody arrangement was contested over the year, including when the allegations came to light. By the time of the court-martial, however, Appellant had signed over his parental rights to both BC and EC.

Shortly after Appellant's divorce was finalized, he started dating ML whom he met online, and after a few weeks they agreed to meet in person for dinner at a restaurant. ML rented a hotel room because she lived about 130 miles away from the restaurant. Appellant had his children BC, EC (four years old at the time), and GG (ten years old at the time) with him. ML also had her two children with her. After dinner and swimming at the hotel's pool, Appellant, ML, and the five children, all under the age of 16 at the time, spent the night together in ML's one-bedroom hotel room. According to Appellant's trial testimony, he and ML were in one bed, while four of the children slept in the adjacent bed and one, BC, slept on the floor. At some point during the night, Appellant and ML had sex, while the children (BC, EC, and GG) were awake. BC "woke up to hearing a really loud squeaky sound," while GG covered BC's face and ears. After this weekend, MC noticed that EC began acting strangely, doing things like trying to stick corners of a blanket into his bottom.

In April 2015, Appellant visited the twins for their birthday. During this trip, Appellant stayed at MC's home with BC and EC while MC went out to dinner with her friends. MC returned home and found Appellant asleep in BC's bed with BC. MC testified that Appellant being in BC's bed was unusual and she told him to leave. In the months following this visit, BC began to suffer from nightmares. As a result of this, MC took her daughter, BC, to see a therapist, EM.

In 2017, Appellant again visited the twins for their birthday. Appellant spent the weekend with them in a temporary lodging room at Hill Air Force Base, Utah. Appellant forced EC to touch Appellant's penis. Although EC was young, he was able to recall that it happened in the bathroom after a shower,

---

[4] At the time of the offenses and Appellant's trial, MC was an enlisted member of the United States Air Force Reserve. This opinion uses her initials as of the time of Appellant's trial.

[5] Appellant's brief and the charge sheet refer to BC and EC as BB and EB, respectively. However, at the time of their testimony, their initials were BC and EC. As such, we refer to them as BC and EC.

and was able to describe Appellant's penis. Following this visit, EC began wetting the bed.

## II. DISCUSSION

### A. Admissibility of BC's Statements to Her Therapist Under Mil. R. Evid. Rule 803(4).

It appears that as Appellant's court-martial neared, it became apparent that BC may not be able to testify fully for the Government. Being deprived of her testimony, the Government sought to introduce BC's statements to her therapist, EM, as substantive evidence under the medical-treatment exception to the rule against hearsay. The Defense objected, but the military judged ruled in the Government's favor. On appeal, Appellant argues that the military judge erred when he admitted BC's hearsay statements to her therapist, EM, as substantive evidence. Appellant claims that the military judge applied incorrect law and improperly applied the facts to the law. Specifically, Appellant takes the position that "[e]ven if this Court ignores the Military Judge's use of an incorrect legal principle, the facts do not support his conclusions when applied to the correct legal principles."

The examples which Appellant provides include that the military judge relied on a subjective expectation by BC that EM was a therapist and that is not the standard required by law; that the statements at issue were made for a personal, not a medical purpose; that there is no evidence that BC believed "truthfulness meant treatment;" and that the hearsay statements are the only substantive evidence against Appellant. As outlined below, these arguments are not persuasive.

#### 1. Additional Background

In October 2017, MC took BC, who was seven years old at the time, to see EM, a trauma therapist and licensed social worker. This was in response to nightmares and anxiety that BC had been experiencing. At their initial meeting, the therapist introduced herself to BC and explained confidentiality to BC in a way that one "can only explain that to a child," in an effort to reinforce that it was a safe space where BC could talk about anything she wanted to and where the therapist and BC could work on her issues. At this initial session, MC was also present and affirmed that it was a safe space where BC could tell the therapist anything and that the therapist was there to help BC in the treatment of her symptoms. At their first session, BC told the therapist that she wanted to "feel happy." BC met privately with the therapist during their subsequent sessions.

From October 2017 through May 2019, BC attended appointments with the therapist approximately once a week. Throughout the treatment period, the

therapist provided BC with various coping skills to help BC mitigate her night-mares and anxiety, and BC eventually disclosed facts of her sexual abuse during treatment.

The military judge considered 40 pages of treatment notes written by the therapist; telephonic testimony of the therapist; a short summary of a recent government interview of BC; and a statement provided by MC to law enforcement before ruling on the admissibility of BC's statements to the therapist. We describe the most pertinent statements that BC made to the therapist that were available to the military judge, most of which are in the treatment records.

On 1 March 2018, BC told the therapist that she remembered the night when Appellant and his girlfriend behaved sexually in front of her, EC, and GG. BC said that she saw Appellant's "butt-butt," and this made BC uncomfortable. BC also described a night when Appellant climbed into bed with her, and that he normally did not do this. The therapist asked if anything happened after Appellant got into BC's bed and according to the therapist's notes, BC "declined" to answer. The therapist annotated that BC was being "more open" about her experiences with Appellant and that they are "working on skills to help [BC] feel safe and secure."

At a later session, on 19 March 2018, BC disclosed that after Appellant climbed into her bed with her, he touched her (BC pointed to her vagina) "outside, not inside" over the bedding covers. BC shared with her therapist that she had pretended to be asleep and that she crossed her legs very tightly during the encounter. Additionally, BC shared with her therapist that Appellant stopped after he had heard BC's mother, MC, return home.

BC disclosed further details in two subsequent sessions about the incident where Appellant climbed into her bed. On 22 March 2018, BC said that Appellant touched her chest under her shirt before touching her vagina. On 10 July 2018, BC said she forgot to tell her therapist a detail about the event where Appellant got into bed with her. BC said, "[Appellant] used three fingers to rub me on the vagina." The therapist asked BC how Appellant touched her, and BC "showed a circular motion with three fingers in the air." BC said that thinking about the event made her sad and nervous, and that she did not like to think about it. The therapist annotated in her notes that BC was "participating in an ongoing case against [Appellant]" and that "[s]he's feeling[ ] seen, heard, and validated" and was "gaining mastery over skills."

At trial, the Prosecution sought to admit testimony from the therapist regarding these statements as an exception to the rule against hearsay for statements made for medical treatment under Mil. R. Evid. 803(4). The Defense

objected under Mil. R. Evid. 803(4).[6] Ultimately, the military judge concluded that the Government had established that the Mil. R. Evid. 803(4) exception to hearsay applied.

As part of his ruling, the military judge found that BC had an understanding that EM was a therapist, and that BC described EM as "her friend who helps her with [her] bad dreams." The military judge specifically considered whether that description of EM as a "friend" eliminated BC's understanding that EM was a therapist, and found it did not. The military judge made further findings, including: that BC had been seeing the therapist from October 2017 up to the time of the court-martial; that based upon the treatment notes and the testimony, the therapist was identified to BC as a social worker; that the therapist explained confidentiality to BC during their first visits; and that BC had "a subjective expectation" that EM was a therapist.

As legal authority, the military judge relied *inter alia* on Mil. R. Evid. 104(a), 304, and 803(4); *United States v. Cucuzzella*, 66 M.J. 57 (C.A.A.F. 2008); *United States v. Gardinier*, 65 M.J. 60 (C.A.A.F. 2007); and *United States v. Morgan*, 40 M.J. 405 (C.M.A. 1994).

The military judge concluded that BC recognized EM as a therapist and that BC's description of her as a friend, "on balance," did not eliminate her understanding that she was a therapist. To reach that conclusion, the military judge equated BC describing the therapist as her "friend" to someone calling a teacher, a pastor, or a doctor a "friend." The military judge explained, "They can all be considered friendly and still have that other role. The impetus of this test is not whether the child considers the person to be a friend, but whether the child understands that the person is a professional acting in their professional role."

The military judge further found that the statements BC made to the therapist were not testimonial. The military judge considered the following facts in reaching this conclusion: the therapist was a mandatory reporter to the Department of Children and Family Services (DCFS) but did not receive questions from DCFS to ask BC so the therapist did not "proceed in an investigative capacity;" the statements were not initiated for any law enforcement purpose, but rather to talk through how "Appellant's actions" made her feel; BC's statements about her abuse were not initiated by the therapist but rather by BC herself; and BC first told MC that her father had touched her but declined to provide MC further details, instead telling her that she wanted to talk to her

---

[6] To the extent that Mil. R. Evid. 513, the psychotherapist-patient privilege, applied to the admissibility of these statements, BC, through her special victims' counsel, waived her privilege.

therapist about it. The military judge also found there was no evidence of suggestibility from MC or authority figures to compel BC to make the statements.

Finally, the military judge conducted a Mil. R. Evid. 403 balancing test and determined that the probative value of the statements was not substantially outweighed by the danger of unfair prejudice. He also concluded that the circumstances surrounding how BC came to see a therapist, and allegations that the timing coincided with an on-going child-custody dispute between Appellant and MC, went to the weight of the evidence, not admissibility.

Although the military judge gave both sides an opportunity to ask questions with regards to the ruling, neither side did. During findings, the therapist testified as a government witness in a substantially consistent manner with her treatment notes described above. After the therapist testified, neither party requested the military judge reconsider his ruling admitting her testimony.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Id*. (citations omitted). "Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo." *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citation omitted). The "abuse of discretion standard is strict, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Erikson,* 76 M.J. at 234 (internal quotation marks and citation omitted).

Specifically as to Mil. R. Evid. 803(4), a "military judge's determination that a patient made a statement for the purpose of medical diagnosis or treatment out of an expectation of receiving medical benefit is a question of fact that we review for clear error." *United States v. Donaldson*, 58 M.J. 477, 485 (C.A.A.F. 2003) (citation omitted).

Regardless of whether the declarant is available as a witness, the rule allows for hearsay statements that are made for, and are reasonably pertinent to, medical diagnosis or treatment as long as the statements "describe[ ] medical history, past or present symptoms or sensations; their inception; or their general cause." Mil. R. Evid. 803(4).

There are two requirements that must be met for statements to be admissible under Mil. R. Evid. 803(4): "first the statements must be made for the purposes of medical diagnosis or treatment," and second, there must be "some expectation of receiving a medical benefit for the diagnosis or treatment that

is being sought." *Donaldson*, 68 M.J. at 485 (internal quotation marks and citations omitted). "While both requirements must be met, the critical question [in this inquiry] is whether [the patient] had some expectation of treatment when she talked to the caregivers." *Id.* (alterations in original) (internal quotation marks and citation omitted). "The key factor" to determine whether the statement at issue falls within the exception is the "state of mind or motive" of the patient and the "expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *Id.* (citations omitted). The underlying presumption for the exception to hearsay under Mil. R. Evid. 803(4) is that the declarant has a "self-interested motivation to speak the truth to a treating physician or an individual in the mental health field in order to receive proper care and the necessity of the statement for a diagnosis or treatment." *United States v. Quigley*, 35 M.J. 345, 347 (C.M.A. 1992) (citation omitted).

Appellate courts recognize "that a small child may not be able to articulate that he or she expects some benefit from treatment." *Donaldson*, 58 M.J. at 485 (footnote, internal quotation marks, and citation omitted). Therefore, "where a child is involved, it is often important for their caretakers to explain to them the importance of the treatment in terms that are understandable to the child." *Id.* (internal quotation marks and citations omitted).

Where the medical purpose and benefit may not be as apparent, Mil. R. Evid. 803(4) "should not be applied in a rote or mechanical manner." *Cucuzzella*, 66 M.J. at 60. Instead, the analysis depends on "the identification of indicia that the elements and the purposes of the exception are met." *Id.* In applying the rule to young children, "where the medical purpose behind a visit might well be apparent to an adult, we have looked to see if the military judge has found indicia that the child herself was cognizant of the medical purpose of the visit." *Id.* (citations omitted).

Counseling involving mental health can similarly "raise complex legal and factual questions." *Id.* This is because, unlike traditional physical examination settings, the patients "may have compound or uncertain purposes for being present, may not be in a position to appreciate the context in which they are making the statements, or may have mixed intent in making the statements in question." *Id.*

### 3. Analysis

We find no abuse of discretion in admitting the hearsay statements pursuant to Mil. R. Evid. 803(4).

As to the requirement of Mil. R. Evid. 803(4) that the statements were made for the purposes of medical diagnosis or treatment, we find that they were. MC retained EM as a therapist for BC when BC was seven years old and

suffering from anxiety and nightmares. At the first session, MC affirmed for BC that meeting with the therapist was "a safe space," that BC "could tell [the therapist] anything," and that the therapist was there to "help" BC "in this treatment of her symptoms." BC's statements about Appellant's abuse occurred in later sessions with the therapist who provided BC help by discussing boundaries and personal space and watching a consent video with BC that was specifically made for children. BC really liked the consent video and watched it five times and then went home and practiced consent with her stuffed animals leading the therapist to conclude that BC felt "very empowered." The therapist provided BC with other coping mechanisms which she used throughout the course of the treatment. Additionally, BC recognized the therapist as an individual who was "helping her with [her] bad dreams."

The military judge's ruling does not find as fact that each of BC's statements were made for the purpose of treatment. If he had, we would have analyzed whether such a finding was clearly erroneous. *See Ellerbrock*, 70 M.J. at 317. Instead, we use our factfinding authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), and conclude that each of BC's statements regarding the charged offenses were made for treatment purposes. Each of these statements by BC were made in a treatment session to EM, a licensed social worker and trauma therapist. At her first session, BC was provided information that EM was a therapist in a manner that was understandable to BC. We also note that BC's disclosures of Appellant's sexual abuse led to specific treatment responses including helping BC understand boundaries, personal space, and consent. Additionally, we take into account that on 16 March 2018, BC told MC that Appellant had done something to her, but instead of giving her details, BC told MC that she wanted to talk to her therapist. Then three days later, BC disclosed details of the abuse to her therapist. This reinforces our determination that BC made these disclosures to obtain help and treatment from her longtime therapist. We conclude there was ample evidence before the military judge that BC's hearsay statements were made for treatment purposes.

With regards to the second requirement of Mil. R. Evid. 803(4) that BC made the statements with some expectation of receiving a medical benefit for the medical diagnosis or treatment that is being sought, we find the military judge did not abuse his discretion. While there was no direct testimony from BC saying those exact words, as a young child, we recognize that she may not have been able to articulate that she expected some benefit from treatment. This is why it was important that the goal of the treatment was explained to her in terms that are understandable to that specific child. This was seen when the therapist explained to BC concepts of confidentiality "in the way that you can only explain that to a child" to "reinforce that it was a safe space where she could talk about anything she wanted to discuss, where we could work on kind of some of the issues that were being presented." MC who was in the room

during the first visit with the therapist also "affirmed that it was a safe space that [BC] could tell [the therapist] anything and that [she] was there to help [BC] in this treatment of her symptoms."

Appellant takes the position that the child's subjective expectation that the therapist was, in fact, a therapist is not the standard. Appellant claims that the military judge's reliance on this as a standard is an abuse of discretion. Appellant's position is not supported by the law. The military judge was to look at the "state of mind or motive of the patient in giving the information" to the therapist as a "key factor in determining whether a particular statement is embraced by the medical-treatment exception." *Donaldson*, 58 M.J. at 485.

Similarly, Appellant's argument that the hearsay statements in question were made for a personal, not medical, purpose is unpersuasive. Appellant points to instances where either BC's therapist or MC would tell BC that she was "brave" for disclosing information about the abuse; that BC considered her therapist to be an "amazing person;" that the therapist helped BC "remember a lot of things that happened in the past;" that the therapist helped BC when she told her things; and the therapist aided BC with "field grounding skills," which are "tools to help detach from overwhelming emotional distress" as examples of these statements being made for personal reasons instead of medical reasons. Appellant does not explain how any of these examples are personal reasons to the exclusion of therapeutic reasons. To the contrary, the facts that Appellant points to actually indicate that BC understood that the conversations with her therapist were related to treatment. Additionally, Appellant provides no law to support his position that having personal reasons for seeking treatment precludes having medical reasons for seeking treatment, and we found none. Therefore, we reject this argument.

Appellant next claims that "there is no evidence that BC believed that truthfulness meant treatment." Appellant continues that "although Trial Counsel and the Court may have believed the evidence established that BC knew she was speaking to a medical provider, there is no evidence that she maintained an expectation or perception that providing truthful information to that provider would help her to be treated or healed." However, as addressed above, one factor for the military judge to weigh in determining whether a particular statement is embraced by the medical-treatment exception is the "state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *Donaldson*, 58 M.J. at 485. Here, the therapist did address this issue as it related to treating BC. Trial defense counsel asked the therapist, "did you all ever talk about the importance of truthfulness or what truth was, or what a lie was?" The therapist explained,

Not necessarily. A big part of therapy is self-determination, even for children. And so [BC] was largely in charge of being able to tell me what she wanted to tell me, and not tell me what she wanted to tell me -- or didn't want to tell me rather. And I was very respectful of those boundaries.

Regardless, "the critical question in this inquiry is whether the patient had some expectation of treatment when she talked to the caregivers." *Id.* The military judge concluded that BC did have an expectation of treatment and made the statements with some expectation of receiving a therapeutic benefit. The military judge's analysis of the second prong and the state of mind of BC were detailed and thorough. We observe no "rote or mechanical application" of Mil. R. Evid. 803(4) in this case.

We find that the military judge properly applied the correct legal principles for Mil. R. Evid. 803(4). We also find that the application of the legal principles to the facts, whether found by us or the military judge, permitted BC's statements to be admitted under Mil. R. Evid. 803(4). Therefore, we find no error in admitting the statements of BC to her therapist.

## B. Legal and Factual Sufficiency

### 1. Additional Background

#### a. Indecent Conduct

ML testified that she and Appellant had sex while the children were in the same hotel room but in a different bed as her and Appellant. BC also testified about this incident. She explained she woke up because she heard "a really loud squeaky sound," and GG[7] covered her face and ears. Appellant testified that he thought the children were asleep because the children were "talking and chattering" and then it got quiet. At some point after midnight, Appellant said that he and ML talked about "being intimate" as long as the children were asleep. Although the bedroom light was off, the bathroom light was on. Appellant claimed that he checked on the children before having sex. Ultimately, Appellant admitted that he had sex with ML in the same room as the children, and that BC was a few inches away from him and ML, and GG was a couple of feet away. Appellant denied that any of the five children heard him and ML having sex.

MC observed Appellant's daughter, GG, telling a sheriff[8] that both she and her sister, BC, had been present in a hotel room while Appellant had sex with

---

[7] GG did not testify at Appellant's court-martial.

[8] In our review of the record, it does not appear the sheriff was related to the investigation into this case.

a woman in front of them. GG's mother also told MC about the hotel sex. When MC found out about the hotel sex, she confronted Appellant as she felt it was inappropriate. In September 2017, MC confronted Appellant a second time about the hotel incident because she wanted to know what happened in the room as she did not know for sure what occurred.

Appellant testified that GG's mother asked him, via text or phone, whether he "had stayed the night with another woman." He further testified that MC "asked the same question" of "whether or not [he] stayed the weekend or the night with a woman" and at this point he "came clean" and told MC that he "stayed with [ML], and that [they] had sex." Appellant explained that he decided to come clean "[b]ecause it was the right thing to do."

### b. Sexual Abuse of a Child

BC testified at trial that she recalled a time when Appellant was babysitting her, and during that occasion Appellant "touched [her] in the wrong place." When asked where the wrong place was, she said, "up here," and the circuit trial counsel explained, "for the record the witness took her right arm and put it up around her shoulder." BC explained that she was in her bedroom, sleeping on her bed, when Appellant touched her in the "wrong place." She also denied being touched in "any other wrong places."

MC testified that in April of 2015, she arrived home and found Appellant lying asleep on BC's bed with BC. MC stated she woke him up and asked Appellant to leave. She also explained that she did not notice any changes in BC's behavior "directly after the incident." However, in the months afterwards, BC started having nightmares. This led to MC taking BC to the therapist in October 2017. In March 2018, BC told MC that Appellant had done something to her but that she wanted to discuss it with her therapist.

The therapist testified during findings that BC told her that Appellant climbed into bed with her and that he touched her vagina and her chest, over her pajamas. BC also told her therapist that she had covers over her and that she pretended to be asleep while he did that to her. BC specifically told her therapist that when Appellant touched her vagina, he used three fingers and she showed her how he touched her and motioned in a circular motion. She also told the therapist that Appellant only stopped when he heard MC return home.

Appellant testified that he, in fact, was at MC's home that night babysitting BC and EC while MC was out. He explained that MC texted or called him, telling him that she was going to have dinner with some friends, so he agreed to go over and "watch the kids." He took the children to pick up food, and they arrived at MC's house around 7:00 p.m. While he could not remember what he did once they arrived home, he testified that because their bedtime was "8:00

pm," he "imagined" that he probably read a story to them, or if he did not have enough time, he would have probably given them their baths, and would have gotten them ready for bed. He also did not recall what time MC arrived at home, but thought she sent him a text message around "11:00 pm, 11:30 pm, or after midnight" to let him know she would be home soon.

Appellant initially testified that he did not recall lying in bed with BC, but agreed that he had done that before, and that it was possible that he was in her bed reading a bedtime story to her.

**2. Law**

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ; *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted.).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the court is convinced of the accused's guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (internal quotation marks and citation omitted). "In conducting this unique appellate role, we take a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt to make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (internal quotation marks and citation omitted), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Reasonable doubt "does not mean that the evidence must be free from conflict." *Id.* (citation omitted).

As it relates to service discrediting conduct, military law does not require that the public know of the accused's conduct. *United States v. Phillips*, 70 M.J. 161, 165 (C.A.A.F. 2011). The law which requires proof of the "nature" of the conduct, does not require testimony regarding views of "the public." *Id.* at 166. Instead, the factfinder has the responsibility of evaluating the nature of the conduct. *Id.* "[P]roof of the conduct itself *may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces." *Id.* at 163.

Additionally, and pertaining to service discrediting conduct, "a factfinder may permissibly conclude that the same piece of evidence proves more than one element of a charged crime, so long as this conclusion is reached independently with respect to each element." *United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015).

"An unconstitutional presumptive conclusion arises when the military judge instructs members that they must conclude that evidence of the charged conduct also satisfies the terminal element." *Id.* This type of instruction is unconstitutional because the Government no longer has to prove that element which removes the burden of proof, undermines the accused's presumption of innocence, and invades "the truth-finding task assigned solely to juries in criminal cases." *Id.* (citations omitted).

### 3. Analysis

#### a. Indecent Conduct

The Specification of Charge II alleged that Appellant wrongfully committed indecent conduct by engaging in sexual intercourse with ML in the presence of children who had not attained the age of 16 years, and the conduct was of a nature to bring discredit upon the armed forces. *See* 2012 *MCM*, pt. IV, ¶ 60.b. The only element in contention here is the terminal element: whether the evidence at trial was legally sufficient to demonstrate that Appellant's conduct was of a nature to bring discredit upon the armed forces.

As is relevant for the disposition of this issue, the military judge accurately instructed the panel members that:

> "Service discrediting conduct" is conduct which tends to harm the reputation of the service or lower it in public esteem.

> With respect to service discrediting, the law recognizes that almost any irregular or improper act on the part of a service member could be regarded as service discrediting in some indirect or remote sense. However, only those acts which would have a tendency to bring the service into disrepute, or which tend to lower it in public esteem are punishable under this Article.

> Not every act of indecent conduct constitutes an offense under the UCMJ. The government must prove beyond a reasonable doubt, either by direct evidence or by inference that the accused's conduct was of a nature to bring discredit upon the armed forces. In resolving this issue, you should consider all of the facts and circumstances, to include: where the conduct occurred; who may have known of the conduct; and, the effect that the conduct may have had upon the morale or efficiency of a military unit.

During closing argument trial counsel argued specifically as to this element of the offense:

> If someone from the public knew that the accused had had sex mere feet away from young children, that would lower the service in the public esteem. When people found out [MC], [GG's] mother, they were upset. They were upset. They thought it offensive. They thought it inappropriate. That is evidence that that conduct lowers the reputation of the service in the public esteem. If you even think about it even in the context of an adult. If an adult had been asleep in the bed next to them, and woke up the next day to find out that people had had sex in the bed a few feet away, that would have been offensive. Here, you have even further. You have young children. And so you have evidence of that element.

Appellant argues that the Government provided no evidence on the terminal element beyond the conduct itself to persuade the factfinder and no evidence that any child who heard the sex was upset by it. Appellant claims that doing this led to the Government to argue that the nature of the conduct made the offense, per se, service discrediting. Therefore, Appellant concludes, there was insufficient evidence that the sex in front of the children would be an act which harmed the reputation of the service or lowered it in public esteem.

First, based on the record, we find no unconstitutional presumptive conclusion as the military judge did not instruct the members that they must conclude that evidence of the charged conduct also satisfies the terminal element. Because of this finding, we further find that the instruction did not relieve the Government of its burden of proof, it did not subvert the presumption of innocence accorded Appellant, and it did not invade the truth-finding task assigned solely to the court members. *See Norman*, 74 M.J. at 150. Instead, we find that the members were appropriately instructed on the elements of the offense and on the Government's burden of establishing each of those elements beyond a reasonable doubt.

While Appellant contests only the legal and factual sufficiency of the terminal element, we reviewed the evidence in the record of trial and find the Government proved beyond a reasonable doubt that Appellant engaged in sexual intercourse in the presence of children. Therefore, the first question we ask is: whether proof of Appellant's conduct of having sex with a woman he met in person for the first time that day, with five children in the same room, with one just inches away, is sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring

discredit upon the armed forces. Second, we must be convinced the Government proved this element beyond a reasonable doubt in our fresh, impartial look at the evidence.

Although public awareness of the conduct to establish the tendency to bring the service into disrepute or lower it in public esteem is not a requirement, we find that three adults were made aware of the conduct: MC, GG's mother, and a sheriff. Additionally, Appellant's argument, that no evidence exists that any child who heard the sex was upset by it, is also unsupported by the record. During the incident GG had to cover BC's face and ears. Then, shortly after the incident, EC began acting strangely, doing things like trying to stick corners of a blanket into his "bum." Because of this, we conclude that there was public awareness of this conduct and it is reasonable that the court members could have used this evidence of public awareness in finding that the element was met and that the Government met its burden.

Based on the evidence before us, and while considering the evidence in the light most favorable to the Prosecution, a reasonable factfinder could have determined each of the elements of the offense, including the service discrediting element, were proven beyond a reasonable doubt. *See Turner*, 25 M.J. at 324. Additionally, based on the same evidence, and after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, and after taking a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt to make our own independent determination as to whether the evidence constitutes proof of the service discrediting element beyond a reasonable doubt, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41; *Wheeler*, 76 M.J. at 568.

### b. Sexual Abuse of a Child

Specification 3 of Charge I alleged that Appellant, on a single occasion, committed a lewd act upon BC, a child who had not attained the age of 16 years, by touching, either directly or through the clothing the genitalia and chest of BC, with an intent to gratify his sexual desire. *See* 2012 *MCM*, pt. IV, ¶¶ 45b.a.(c); 45b.a.(h)(1), (4), (5)(A).

Appellant argues that the only evidence of his guilt is the hearsay statements of BC to her therapist; that those statements are not trustworthy as BC made the statements "for a personal purpose without subjectively believing that her truthfulness in making the statements was important, all in the midst of a custody dispute between her parents;" and that BC not only failed to reiterate the allegation at trial when under oath, but "flatly denied the allegation." Finally, Appellant concludes that "these hearsay statements of a child complainant who denied the allegation under oath at trial are not sufficient to sustain [Appellant]'s guilt as to Specification 3 of Charge I."

We disagree with Appellant that his conviction rests solely on hearsay statements admitted as substantive evidence; those statements were supported with other testimony. A reasonable factfinder could rely on hearsay, coupled with corroborating evidence presented at trial to find the government has met its burden. *See United States v. Ureta*, 41 M.J. 571, 580 (A.F. Ct. Crim. App. 1994), *aff'd*, 44 M.J. 290 (C.A.A.F. 1996).

Appellant simply claims that BC's statements to her therapist are not trustworthy, then argues that we should not rely on them as sufficient evidence against him. However, as noted above, we are satisfied as to the trustworthiness of the statements, finding no abuse of discretion in their admission and use as substantive evidence of Appellant's guilt. Nonetheless, BC's statements to her therapist are not the only statements of that night and we do not analyze them in a vacuum. Her statements are corroborated by Appellant himself who testified that he was at her home and that he was taking care of BC. Although Appellant only testified that it was "possible" that he was in bed with her, this was corroborated by MC's testimony that Appellant was, in fact, in bed with BC when she arrived home. Her therapist's testimony was additional evidence from BC as to what her father did, and did not do to her. As each one of these witnesses corroborated a different portion of BC's recollection of events, we find it, and the complained-of hearsay credible. Additionally, Appellant's request to discount testimony simply because it occurred during a dissolution of marriage would be to do so without any reliance on law.

We carefully considered that BC's trial testimony did not include that Appellant touched her anywhere close to her vagina. However, a reasonable factfinder could have determined that BC's statements to her therapist, while not under oath, proved this essential element of the offense. A reasonable factfinder could have disbelieved the portion of BC's testimony that denied other wrongful touching by Appellant. *See United States v. Snipes*, 18 M.J. 172, 175 (C.M.A. 1984). After considering the testimony of BC, MC, BC's therapist, and Appellant, in the light most favorable to the Prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *See Turner*, 25 M.J. at 324. Additionally, based on the same evidence, and after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, and after taking a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt to make our own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41; *Wheeler*, 76 M.J. at 568.

**C. Mil. R. Evid. 603**

**1. Additional Background**

The other fraternal twin, EC, was nine years old when he testified. MC testified that at the age of two, EC was diagnosed with autism. This impacted his speech, and early on it also impacted his motor skills. When he would become overstimulated, he would "stim." MC explained that "stim" means "when an autistic person is processing, or overstimulated, they tend to do repetitive movements, such as, flap their arms." She further explained that "in [EC]'s case he likes to run back and forth, repeatedly." When Appellant testified, he explained that although EC has autism, "he's made great strides to be able to overcome those things. Right now the only thing that he has is a speech issue."

Ultimately, EC testified remotely at Appellant's court-martial. At the beginning of the testimony, EC gave his full name, explained that he used to have Appellant's last name but that changed as MC was no longer Appellant's wife. His conduct throughout the testimony was consistent with MC's description of EC's autistic behaviors. He had difficulty concentrating on the questions he was asked and sometimes he had to be asked questions several times before he provided a responsive answer. Additionally, he was initially distracted by an object on the table, was turning and rolling around in the chair, and walked back and forth at the end of the table. Nonetheless, EC was able to testify and testify fully. He correctly answered "nine" when asked how old he was, he gave the correct date and that it was the last day of the month. Trial counsel asked EC about the color of EC's shirt, and EC replied, "Hawaii." When asked if his shirt was yellow, EC correctly said, "Nope." When trial counsel specifically asked, "If I said that the shirt that you're wearing right now was a yellow shirt would that be true? Is your shirt yellow?" EC answered, "No, my shirt is not yellow." Trial counsel then followed up with "If I said that the shirt that you're wearing right now was a Hawaii shirt," EC answered, "True."

Trial counsel then asked, "So we talked a minute ago about your shirt, and about telling us stuff that's true. Will you promise that when we ask you the questions today you'll only tell us stuff that's true?" EC's response was, "Um-huh," to which trial counsel stated, "Okay. And that's an affirmative response from the witness." Trial defense counsel did not object, and did not request clarification or to voir dire EC on his ability to answer truthfully. At the end of EC's testimony, EC spontaneously remarked, "[E]verything I say is true."

**2. Law**

"Before testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience." Mil. R. Evid. 603.

Mil. R. Evid. 603 "establishes no specific colloquy to be used in carrying out" an oath or affirmation to testify truthfully. *United States v. Washington*, 63 M.J. 418, 424 (C.A.A.F. 2006) (citation omitted). Any process that will "awaken the witness's conscience" will suffice. *Id.* (citation omitted). This "rule is designed to afford the flexibility required in dealing with . . . children and that [a]ffirmation is simply a solemn undertaking to tell the truth." *Id.* (alterations in original) (citation omitted). "[Mil. R. Evid.] 603 requires no special verbal formula, but instead requires that the oath be meaningful to the witness, including a child witness, and impress upon the witness the duty to tell the truth." *Id.* (citations omitted). Further, "[Mil. R. Evid.] 603 is written to permit . . . children and individuals with emotional difficulties to satisfy the basic criterion of affirming their duty to tell the truth." *United States v. Morgan*, 31 M.J. 43, 47 (C.M.A. 1990) (citation omitted). When the colloquy between the child and trial counsel sufficiently demonstrates that the witness knew the difference between truth and a lie, and that the child intended to tell the truth, Mil. R. Evid. 603 will be satisfied. *See id.*

When counsel does not object to an alleged error under Mil. R. Evid. 603, the issue is forfeited, and we review for plain error. *See United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). "Under our plain error analysis, Appellant must show that there was error, the error was plain or obvious, and that the error materially prejudiced his substantial rights." *Washington*, 63 M.J. at 424 (citation omitted).

**3. Analysis**

Appellant claims that plain error exists to the material prejudice of his substantial rights, in that the oath administered to EC neither confirmed the child's understanding of the difference between a truth and a lie nor impressed upon EC the duty to tell the truth.

Appellant specifically points to each opportunity in which EC could have answered in an adult-like fashion of "yes/no" or "truth/lie," but instead chose non-responsive answers. Appellant then attacks EC's ability to determine the difference between a truth and a lie. However, it is clear from this record that EC did not answer in such a linear fashion. Instead, trial counsel asked questions that would demonstrate EC's ability to distinguish between veracity and falsity in his own manner. Trial counsel accomplished this through the use of EC's shirt style and color. When asked if his shirt was yellow he answered with "nope" and when asked again if it would be true to say he was wearing a yellow shirt, EC answered, "No, my shirt is not yellow." That satisfied the falsity prong. As to truthfulness, trial counsel stayed with the shirt theme and asked, "If I said that the shirt that you're wearing right now was a Hawaii shirt;" and EC answered, "True." Appellant attacks this statement as interrupting trial

counsel. Although EC may have answered quickly, there is nothing in law or fact that disqualifies the answer.

Next Appellant argues that plain error exists because the oath administered to EC never affirmed his understanding of the importance of truth telling at trial as evidenced by EC responding "um-huh" when trial counsel asked him to promise to tell the truth. However, trial counsel, in front of trial defense counsel and the military judge, explained, "[T]hat's an affirmative response from the witness." Trial defense counsel did not object to trial counsel's characterization of EC's response.

We do not find error which was plain or obvious. However, even if we were to assume this was error to accept "um-huh" as an affirmative response, Appellant does not convince us that the error materially prejudiced his substantial rights. While Appellant claims that the error implicates his Sixth Amendment right to meaningfully confront the witnesses against him, he also concedes that his trial defense counsel had the opportunity to cross-examine EC and did so.

We also note that while at the end of EC's testimony, he explained, "everything I say is true," the rule contemplates this coming prior to the testimony. Nonetheless, our superior court did not find prejudice when this portion occurred subsequent to the testimony. *See Washington*, 63 M.J. at 424.

Therefore, we find that even if it was error which was plain or obvious to accept "um-huh" as a response to a promise to testify truthfully, we find no prejudice.

## D. Whether Appellant's Sentence is Inappropriately Severe

### 1. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find[ ] correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Fields*, 74 M.J. 619, 625 (A.F. Ct. Crim. App. 2015) (citations omitted). While we have significant "discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency." *Id.* (citations omitted).

"The power to review a case for sentence appropriateness, including relative uniformity, is vested in the Courts of Criminal Appeals." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). The law does not require that we engage in sentence comparison with specific cases "except in those rare instances

in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *Id*. (citations omitted). Additionally, "an appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden, . . . then the Government must show that there is a rational basis for the disparity." *Id.*

When arguing sentence disparity and asking us to compare his sentence with the sentences of others, Appellant bears the burden of demonstrating those other cases are "closely related" to his, and if so, that the sentences are "highly disparate." *See United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). Cases are "closely related" when, for example, they include "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* If an appellant carries that burden, then the Government must show a rational basis for the sentence differences. *Id.*

Additionally, during our Article 66(c), UCMJ, review of sentence appropriateness, we may, but are not required to, consider cases that are not "closely related" to Appellant's. *See United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001); *Lacy*, 50 M.J. at 288.

**2. Analysis**

Appellant argues that the "confinement is unduly severe, particularly in comparison to sentences received in closely related cases involving non-penetrative offenses." He also argues that his sentence is unduly severe because he "stands convicted of just three non-penetrative acts, each of which occurred briefly and on just one occasion." We disagree as to both arguments.

The maximum punishment in this case, based on the verdict, was 45 years of confinement, a dishonorable discharge, forfeitures of all pay and allowances, and reduction to the grade of E-1. Appellant was sentenced to 12 years of confinement, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to the grade of E-4.

At the time of Appellant's conviction, he had been in the military for approximately twenty-two years, and had completed two combat deployments to Iraq.

MC, who was appointed as BC and EC's representative under Article 6b, UCMJ, 10 U.S.C. § 806b, delivered an unsworn statement under R.C.M. 1001A. MC explained to the members that BC goes to bed each night terrified that her nightmares will become reality; that she cannot sleep in her own room without her 12-year-old step-brother camped out on her floor; that she cannot have a sleepover with her sister without her half-sister sleeping on the floor in

front of a closed door; and that she has anxiety leaving school because she worries Appellant will kidnap her.

Members also learned that EC suffers from unnecessary worry and anxiety based on Appellant's conduct. Specifically, the members heard that EC has experienced anxiety over the possibility that he will die and not go to heaven or ever see his "papa" (MC's father) again, because Appellant told him that if he told anyone what happened, that this would be the result. The members also learned that simply driving past a Ford Explorer makes EC scared because he thinks it is Appellant in the vehicle.

While Appellant asserts his sentence is unduly severe in comparison to closely related cases, he has not cited to any particular case for our consideration. Moreover, while we may consider the sentences in other cases even if they are not closely related to Appellant's, we decline to do so. "The appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). Here, we find no reason to deviate from the general rule set out in *LeBlanc*.

As to his second argument, we have considered this particular appellant, the nature and seriousness of the offenses, Appellant's record of service including his combat service, and all matters contained in the record of trial. In doing so, we find that his service record, while noteworthy, pales in comparison to the long-lasting emotional and psychological harm he caused his biological children, BC and EC. We find Appellant's sentence is not inappropriately severe.

## E. Timeliness of Appellate Review

This case was docketed with this court on 24 October 2019. Appellant requested and was granted four extensions of time prior to filing his assignments of error on 22 April 2020. The Government filed its answer on 18 May 2020. Neither at the time of filing his appeal nor during the pendency of his appeal did Appellant file a demand for speedy appellate review.

The delay in rendering this decision after 24 April 2021 is presumptively unreasonable. However, we determine there has been no violation of Appellant's due process right to a speedy appellate review.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when a Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id*. at 142. Where there is

such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533).

Concerning prejudice, the CAAF identified three types of interests for prompt appeals: (1) prevention of oppressive incarceration; (2) minimizing anxiety and concern; and (3) limitation of the possibility of impairment of the appellant's ability to present a defense at a rehearing. *Moreno*, 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration nor impairment of the defense at a rehearing because Appellant has not prevailed in his appeal. *See Id*. at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*. Appellant has articulated no such particularized anxiety in this case, and we discern none.

There are several factors explaining this delay. First, we note the record of trial is not insubstantial, including over 720 pages of transcript and significant appellate exhibits for review. Second, Appellant took approximately half a year to file his assignments of error after requesting the enlargements of time. Third, Appellant asserted four errors, the careful consideration of which has resulted in a lengthy opinion from the court. In the face of these issues, we do not find egregious delay here, especially in light of the fact much of the delay was at Appellant's behest and the amount of delay by which the *Moreno* standard was exceeded to issue this opinion is measured in days, not months.

Where, as here when Appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We do not find such egregious delays here. Appellant has neither demanded speedy appellate review nor asserted that he is entitled to relief for appellate delay. Accordingly, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *See id*.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v.*

*Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court